330 So.2d 137 (1976)
Charles Dwight MESSER, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. 46849.
Supreme Court of Florida.
March 31, 1976.
*138 James Ron Shelley, Public Defender, and John W. Fleming, Asst. Public Defender, for appellant.
Robert L. Shevin, Atty. Gen., and Gerald L. Knight, Asst. Atty. Gen., for appellee.
SUNDBERG, Justice.
Appellant, a 29-year-old male, appeals his conviction for first degree murder and robbery and sentence of death. This Court has jurisdiction under Article V, Section 3(b)(1), Florida Constitution, and Section 921.141(4), Florida Statutes. The facts of the case are as follows.
On the morning of November 27, 1973, two hunters discovered the body of a male, 25 to 30 years old, in a partially wooded area called Garcon Point. The hunters called the Sheriff's Department, and subsequent investigation revealed that the body was that of Henry N. Fowler, III, who died of a bullet wound in the brain. In January, 1974, appellant advised Alabama authorities that he wanted to clear his conscience about a Florida killing. The Florida State Attorney traveled to Alabama; when immunity was refused, appellant agreed to "talk" anyway, waiving his Miranda rights. He told the State Attorney that he and Ronnie Brown (subsequently his co-defendant) were present when a third man killed and robbed the victim; appellant identified photographs of the victim and the scene of the crime. The following day appellant waived for the second time his Miranda rights and made a second statement which was similar to the first but with certain differences; he agreed to travel to Florida in order to point out the location of the crime. On January 23, 1974, appellant visited and identified the scene of the crime; also, he waived his Miranda rights for the third time and gave two more recorded statements. In *139 the meantime, a statement had been taken from co-defendant Brown. According to appellant's final statement, he and Brown had been traveling on the Interstate Highway, he had been drinking liquor and beer, and they stopped at a rest area to look for toilet facilities. When they stopped, they decided to rob the victim, who was asleep in a parked car in the rest area. The pair entered the victim's car, held him up, drove him to several locations; ultimately Brown struck the victim, and appellant shot him once in the head. Brown had previously taken the victim's wallet and watch, and the pair divided $120.00 and disposed of the victim's wallet, personal effects, and car tag.
Appellant was indicted on February 6, 1974, for the first degree murder and robbery of Henry N. Fowler, III. Appellant's motion to suppress confession was heard by the trial court on December 2, 1974, which motion was denied, the court finding that appellant was fully aware of his Miranda rights at the time he made his statements, that appellant's statements were not the result of any promise, threat or undue influence, that his statements were freely and voluntarily made, and that appellant intelligently waived his Miranda rights. At the close of the suppression hearing appellant's jury trial commenced. On the second day of the trial appellant moved for a mistrial on the ground that two deputies who were witnesses went to lunch with the jury; that motion was denied after court investigation revealed that no discussion about the case occurred between the deputies and the jurors. During the course of the trial appellant's attorney was permitted to place in the record (but not put before the jury) the fact that appellant's co-defendant Brown had entered a plea of guilty to second degree murder and had been sentenced thereon. After the jury found appellant guilty as charged the court proposed to commence the advisory sentencing hearing on the following morning; appellant's attorney objected on the grounds that he had not had sufficient time to prepare for such hearing, but this objection was overruled. During the advisory sentencing hearing, appellant's counsel was not allowed to introduce into evidence a demonstration with a metronome designed to show the jury the severity and length of twenty-five years in prison as a sufficiently severe alternative to the death penalty; this demonstration was ruled inadmissible as being irrelevant to the issue. A majority of the jury recommended the death penalty, which recommendation was followed by the court which sentenced appellant to die in the electric chair. This appeal followed.
We first turn our attention to the fact that an outburst by the victim's mother occurred in the courtroom during appellant's closing argument to the jury. According to the record, appellant's attorney was in the midst of his closing argument when the events with which we are concerned took place. These events are documented in the record as follows:
"(At this point, a woman seated in the courtroom was overcome with emotion and was taken from the courtroom. It was later determined by the court reporter that this was the victim's mother.)"
Immediately following that notation, the record reveals that appellant's attorney did not object or request a mistrial at this point but, instead, continued his closing statement as follows:
"That's what we're dealing with right there  a boy is dead, and I want someone to die. It is the same total disregard for life and breath that God gives that led Charles Messer to kill an innocent man in the wilderness."
At this point appellant's attorney requested a break in his argument; a brief recess was taken after which the court recessed for lunch. Thereafter, appellant's attorney continued his closing argument  again without objection regarding the outburst earlier, without having the jury instructed *140 to disregard it, and without moving for a mistrial. He argued as follows:
"Just before we broke for the luncheon recess the lady that I think you know who she is because of the questions that were asked you before we selected the jury that's in the box now  there was an outburst, and the court has offered to give an instruction to disregard it because you are not to consider it  that's not something you should consider under the law and instructions of the court. I made a comment just before we broke, and I feel that we have to go back to that comment to pick up the continuity of where I was at... . [W]hat we saw there  what was taking place with that lady  is exactly what's involved in whether or not this community is going toward the execution of this defendant. It is called revenge... . And that's the point I was trying to make when we had that difficulty before."
In his rebuttal argument, appellant's attorney in referring to the death penalty statute stated as follows:
"... [T]hat's not a bad law. It simply says we will admit the feelings of wrath, of vengence, or resentment, the desire to take the mother of this boy and take her to one side and say, `we're going to try to make things right... .'"
After the jury's verdict of guilty was returned the court held a sentencing hearing. At the beginning thereof the court conducted an evidentiary hearing on a motion for new trial based on the statements made by the victim's mother during the closing argument. The State Attorney did not object to the hearing of witnesses on this matter, stating that he was in the court and could not hear the mother's remarks and that he wanted to clarify for the record whether or not the jury was able to hear her. Three witnesses were examined under oath, the first being a newspaper reporter who testified as follows:
"A It was during arguments to the jury as to the death penalty. You were making your comments to the jury at that time.
"Q What occurred, sir?
"A ... I turned to observe Mrs. Fowler being led from the courtroom in tears.
* * * * * *
"A She was the mother of the victim.
"Q Were you able to make out any of the words or anything that she said?
"A No, sir, I was not. I did hear some words being spoken, but it took me in such a surprise that I didn't actually hear myself.
* * * * * *
"A ... I don't recall observing any emotion the jury might have had.
* * * * * *
"JUDGE: That would put you some 30  35 feet from the jury box yourself, is that correct?
"A Yes, sir.
* * * * * *
"JUDGE: So [Mrs. Fowler] would have been roughly 25 feet from the jury, wouldn't you say?
"A Yes, sir, I would say that.
* * * * * *
"JUDGE: And you didn't understand what she said?
"A No, sir. It was not audible to me.
* * * * * *
"Q ... Did you feel it was a dramatic outburst?
"A I felt it was... ."
The second witness examined was a deputy sheriff who testified as follows:

*141 "Q Did you hear, and can you describe what occurred?
"A I heard a sound, but I cannot describe the words that were said.
* * * * * *
"Q At the time you heard them, could you hear what was said?
"A No, sir. It was not something that I could understand.
* * * * * *
"JUDGE: So you would have been roughly 20 to 25 feet from the lady as she was speaking, is that correct?
* * * * * *
"A Yes. And it would be approximately 20-25 feet."
The third witness examined was an investigator with the sheriff's department who characterized the occurrence as a "disruption"; he stated under oath:
"A ... There was some statement made to the jury when I observed her or heard her make some statement, which I couldn't put it all together, and then she was taken out of the courtroom...
"Q Were you able to hear anything that she did say?
"A I couldn't put it all together, no sir.
"Q Could you give it to us in pieces?
"A ... She stated, `How do you know that he done something...', and at that point she was taken out of the courtroom, and I couldn't hear the rest of it. She didn't say it all that loud."
The record indicates that, having heard this testimony, and having considered appellant's motion for new trial, the court entered its denial.
We note with interest that on page eight of appellant's own brief he states: "In all candor Appellant concedes that there is ample evidence to sustain the judgment of conviction and that said evidence was properly admitted. Appellant also concedes that there was no substantial prejudice caused by the minor incidents raised in Appellant's assignments of error ... 4 [relating to the mother's courtroom outburst]."
We must agree with appellant's characterization that this event was a "minor incident" which did not substantially prejudice him. We are particularly inclined to this view in light of the fact that appellant's counsel in his argument emphasized both the outburst, which apparently was not heard by the jury, and the revenge motive which allegedly was expressed. Having taken advantage of the situation, appellant may not be heard to complain of it now merely because his argument was not accepted.
We have considered appellant's remaining points on appeal with respect to the verdict and judgment of guilt of the crimes charged and find them to be without merit.
We now turn our attention to the question of whether the death penalty statute was properly applied by the trial court during the sentence advisory hearing portion of the trial.[1] It is our conclusion that the trial court erred in application of the statute in two particulars. First, although there is evidence in the record of the plea-bargained second degree murder sentence received by appellant's accomplice Brown, appellant was not permitted, during the sentencing portion of the trial, to submit this evidence to the jury. We believe the jury was entitled to know that the co-defendant, Ronnie Brown, negotiated a plea of guilty to second degree murder and was sentenced to 30 years imprisonment. See Slater v. State, 316 So.2d 539 (Fla. 1975). Although the Slater case, supra, involved evidence that the "trigger man" was permitted to negotiate a plea for a sentence *142 of life imprisonment, under the facts of this particular case we believe the reasoning of Slater applies with equal force. It was there stated, "Defendants should not be treated differently upon the same or similar facts." In the instant case, although the appellant did fire the shot into the head of the victim, this shooting occurred after Brown took a wallet containing $120 and a watch from the victim, then struck him in the back of the head. There is little to separate out the joint conduct of the co-defendants which culminated in the death of the decedent. The sentence afforded to Brown certainly is not determinative of the sentence which appellant should receive; however, the jury should have had the benefit of the consequences suffered by the accomplice in arriving at its recommendation of the sentence to be visited upon the appellant.
Additionally, we believe counsel for the defendant was effectively deprived of establishing an important mitigating circumstance when he was not afforded the opportunity to present psychiatric testimony to the jury during the sentencing portion of the proceedings. Subsection 921.141(6)(b), Florida Statutes, provides as a mitigating circumstance that "[t]he capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance." Counsel for the appellant represented to the court that, if given the opportunity, he would come forward with evidence establishing such condition. The expression by the trial court that the verdict of the jury is merely advisory and that he could consider psychiatric reports at the time he performed the actual sentencing, in our opinion, violates the legislative intent which can be gleaned from Section 921.141, Florida Statutes. It is clear that the Legislature in the enactment of Section 921.141, Florida Statutes, sought to devise a scheme of checks and balances in which the input of the jury serves as an integral part. The validity of the jury's recommendation is directly related to the information it receives to form a foundation for such recommendation. Subsection 921.141(1), Florida Statutes, provides in part:
"... In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence, and shall include matters relating to any of the aggravating or mitigating circumstances enumerated in subsections (6) [sic] and (7) [sic] [of this section]. Any such evidence which the court deems to have probative value may be received, regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements... ."
The quoted language indicates that the circuit judge should exercise the broadest latitude in admitting evidence during the sentencing portion of the jury's deliberations.
Accordingly, we are compelled to the conclusion that this cause should be remanded to the trial court for the purpose of conducting another sentencing hearing before a jury impaneled for that purpose at which the evidence improperly excluded may be considered. We recognize that this will result in a hearing before a different jury from that which heard the evidence upon which the verdict of guilty was rendered. However, we find authority for such procedure in that portion of Subsection 921.141(1), Florida Statutes, which states:
"... If the trial jury has been waived or if the defendant pleaded guilty, the sentencing proceeding shall be conducted before a jury impaneled for that purpose, unless waived by the defendant... ."
Also, by Chapter 74-379, Laws of Florida, effective October 1, 1974, the following language was added to Subsection 921.141(1), Florida Statutes:
"... If, through impossibility or inability, the trial jury is unable to reconvene for a hearing on the issue of *143 penalty, having determined the guilt of the accused, the trial judge may summon a special juror or jurors as provided in Chapter 913 to determine the issue of the imposition of the penalty... ."
Even though the last-quoted provision was not in effect at the time of the offense or at the time the appellant was indicted,[2] it buttresses our conclusion that the proper course in this analogous situation is to impanel a special jury to consider the evidence of aggravating and mitigating circumstances and make its recommendation to the trial court for proper sentencing pursuant to Section 921.141, Florida Statutes.
The judgments of guilt of robbery and of first degree murder are affirmed but the cause is remanded to the trial court with directions to conduct further proceedings consistent with the views expressed herein.
It is so ordered.
OVERTON, C.J., and ROBERTS, ADKINS, BOYD, ENGLAND and HATCHETT, JJ., concur.
NOTES
[1] Fla. Stat. § 921.141 (1973).
[2] Castle v. State, 330 So.2d 10 (Fla. 1976).