343 So.2d 1266 (1977)
Elwood Clark BARCLAY and Jacob John Dougan, Jr., Appellants,
v.
STATE of Florida, Appellee.
No. 47260.
Supreme Court of Florida.
March 17, 1977.
Rehearing Denied April 7, 1977.
*1267 Ernest D. Jackson, Sr., of Jackson & Micks, Jacksonville, for appellants.
Robert L. Shevin, Atty. Gen., and Wallace E. Allbritton, Asst. Atty. Gen., for appellee.
PER CURIAM.
We have for review on direct appeal from the Circuit Court of Duval County, judgments of guilty of murder in the first degree and sentences of death. We have jurisdiction pursuant to Article V, Section 3(b)(1), Florida Constitution.
Appellants were indicted for the first degree murder of Stephen Anthony Orlando, were found guilty by a jury who after advisory hearing recommended that the death sentence be imposed as to Dougan and that life imprisonment be imposed as to Barclay,[1] were convicted and sentenced to death.
As evidenced by the sentencing order of the trial judge and supported by the record, the facts surrounding the slaying which the judge characterized as a random, racial hate murder are as follows:
"The essential facts as brought out in the trial and by the evidence were that the four defendants were part of a group that termed itself the `BLACK LIBERATION ARMY' (BLA), and whose apparent sole purpose was to indiscriminately kill white persons and to start a revolution and a racial war.
"The testimony showed that on the evening of June 17, 1974, Dougan, Barclay, Crittendon, Evans and William Hearn set out in a car armed with a twenty two caliber pistol and a knife with the intent to kill a `devil'. The devil being any white person that they came upon under such advantageous circumstances that they could murder him, her or them.
"That as they drove around the City of Jacksonville they made several stops and observed white persons as possible victims, but decided that the circumstances were not advantageous and that they might be observed or thwarted in their evil purpose by possible witnesses. At one stop, Dougan wrote out a note  which was to be placed on the body of the victim ultimately chosen for death.
"Eventually the five men headed for Jacksonville Beach where they picked up a hitch hiker, eighteen year old, Stephen Anthony Orlando. Against his will and over his protest they drove him to an isolated trash dump, ordered him out of the car, threw him down and Barclay repeatedly stabbed him with a knife. Dougan then put his foot on Orlando's head and shot him twice  once in the cheek and once in the ear  killing him instantly. Crittendon and Evans played a lesser degree in the murder and were thus convicted of murder in the second degree.
"The evidence showed that none of the defendants knew or had ever seen Orlando before they murdered him. The note, which Dougan had previously written, was stuck to Orlando's body by the knife of the murderers. The note read:
"`Warning to the oppressive state. No longer will your atrocities and brutalizing of black people be unpunished. The black man is no longer asleep. The revolution has begun and the oppressed will be victorious. The revolution will end when we are free. The Black Revolutionary Army. All power to the people.'
"Early the following morning the dead body of Stephen Anthony Orlando was *1268 discovered  police were called to the scene and the knife and note were preserved for evidence and photos were taken of the dead body and surrounding area. An F.B.I. document and handwriting expert compared the death note with other handwriting of Dougan and testified that they were both written by the same person.
"Subsequent to the murder the defendants Barclay and Dougan, by their own admission, and supported by the testimony of state's witnesses, made a number of tape recordings concerning the murder. These recordings were mailed to the Mother of Stephen Anthony Orlando and to radio and television stations. All of the tapes contained much the same in content and intent. The following two pages are excerpts of several tapes which were typical of all  as follows:
"`Stephen A. Orlando was not murdered, by no means. He was given a fair trial, the same type of fair trial that you gave black people, those same black people who occupy 25 per cent of the American population and 75 per cent of the American prison population. He was tried and found guilty and was executed... .'
"`If you want to know how to spell `Americans,' just spell it with three Ks instead of one C, you know, like in Ku Klux Klan. You know white people, you can't do right; your nature is evil. But you gonna pay anyway so the black man's freedom must be gotten no matter what it takes. We can't depend on you for our freedom. We tried that once. You freed us with good ole Abe. He gave us the Emancipation Proclamation. That was the first time we were free. Then we dreamed a little longer, suffered a whole lot more, until you decided `I'm gonna free those niggers again.' Then you gave us the Civil Rights Bill. How many times do you have to free a people before they are free? You know, like, once you freed us, twice you freed us. The third time you might free us for good, just wipe us out like you're trying to do our race as it is, pushing genocide off on black women, trying to eliminate our race, pushing those jive pills off on them. You don't force that off into your urban white, lily white neighborhoods... .'
"`Mary Ann Mallory (Orlando's mother), don't feel so bad. You haven't lost a son; you got a hero. Your son will go down in black history. He'll be enshrined when black people get their freedom....'
"`You take advantage of us. You oppress us in our black ghettos, then when we rebel, then you come in with your tanks and your National Guards and you spray black people with all that tear gas and you just take advantage of black people... .'
"`We're tired, white man. We're tired of being hasseled, pushed around, told what to do and then having to send our kids to school with you and your funky white offsprings, those things, those stringy-haired things you call your kids ... You see, you white devil, our minds are far superior to that of a white man due to the fact that you have a six-ounce brain and the black man has a seven-and-a-half ounce brain... .'
"`The reason Stephen was only shot twice in the head was because we had a jive pistol. It only shot twice and then it jammed; you can tell it must have been made in America because it wasn't worth a shit. He was stabbed in the back, in the chest and the stomach, ah, it was beautiful. You should have seen it. Ah, I enjoyed every minute of it. I loved watching the blood gush from his eyes... .'
"`He died in style, though, begging, begging and pleading for mercy, just as black people did when you took them and hung them to the trees, burned their houses down, threw bombs in the same church that practices the same religion that you forced on these people, my people.

*1269 "`We are everywhere; you cannot hide from us. You have told your people to get off the streets and to stay home. That will not help, for one night they will come home and we will be there waiting. It has been said, look for us and you cannot see us; listen for us and you cannot hear us; feel for us and you cannot touch us. These are the characteristics of an urban guerilla.'
"All of the tapes ended, `Signed, Your Black Liberation Army.'"
In detail, the Judge explained each of the aggravating and mitigating circumstances defined by statute and their application to the instant cause, and concluded that the death penalty was the appropriate punishment for appellants. As to the aggravating circumstance of heinousness or atrocity of the crime, the trial judge stated:
"The defendants, Barclay and Dougan, together with others premeditatedly and deliberately stalked their victim and brutally murdered him.
"The victim's only crime was that he was of a different racial group than his murderers. That he in no way offended them nor did he even know them before that fatal evening.
"The victim, Stephen Anthony Orlando, was knocked to the ground and repeatedly stabbed by Barclay as he writhed in pain begging for mercy. Then Dougan shot him twice in the head at close range.
"In addition to an unprovoked, premeditated murder  it was a declaration of war against a racial group  with the promise of more violence, death and revolution to come.
"Such acts of the defendants were of the basest, most callous, homicidal type and shriek out for the severest punishment and the termination of the existence of the perpetrators."
We have carefully considered each of the numerous points raised on appeal by appellants and find that none of them constitute reversible error.
Sections 782.04 and 921.141, Florida Statutes, are not unconstitutional nor were they unconstitutionally applied to appellants. State v. Dixon, 283 So.2d 1 (Fla. 1973), Alford v. State, 307 So.2d 433 (Fla. 1975), and Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913, decided July 2, 1976.
Relative to appellants' argument that they were denied the right to be tried in the county where the crime occurred, we initially note the following excerpt from the record taken from the hearing on motion for new trial:
"THE COURT: Insofar as the motions made by Mr. Jackson are concerned, the Court ruled upon the issue of the trial in Duval or St. Johns County, finding from the evidence that the incident occurred in Duval County, culminated in St. Johns County; read the specific statute with further instructions to the jury as to that particular aspect of the law. There has been no motion for change of venue insofar as St. Johns County was concerned or motion for change of venue to any other county. The evidence showed that the defendant got in the car, whether it was an abduction, kidnapping or whatever, it started in Duval County and then culminated in St. Johns County."
The indictment charged that appellants "in the County of Duval and the County of St. Johns, State of Florida, unlawfully and from a premeditated design ... did kill the said Stephen Anthony Orlando." The State cites the Court to Article I, Section 16, Florida Constitution, providing:
"If the county is not known, the indictment or information may charge venue in two or more counties conjunctively and proof that the crime was committed in that area shall be sufficient."
and Section 910.05, Florida Statutes, providing:
"If the acts constituting one offense are committed in two or more counties, the offender may be tried in any county in which any of the acts occurred."
Appellants were properly tried in Duval County, for the reasons well expressed by *1270 Judge Smith with respect to one of Dougan's and Barclay's co-venturers. Crittendon v. State, 338 So.2d 1088, opinion filed October 11, 1976 (Fla. 1st DCA).
Appellants contend that they were denied a fair and impartial trial because the prosecutor failed to reveal on direct examination complete details of a plea bargain agreement with a witness in exchange for his testimony. The State emphatically denies that the prosecution ever at any time deliberately and intentionally withheld any of witness Hearn's statement. No false testimony was given in this regard as is suggested by appellants. During the motion for new trial, appellants charged that the State willfully refused to disclose the full plea bargain agreement on direct examination. To this charge, State Attorney Austin expressly objected, as follows:
"MR. AUSTIN: Your Honor, I'm  just a minute. I'm just going to make an objection that that's a bad faith argument; that this lawyer knows if Hearn had opened his mouth about the second murder it would have been a mistrial, and he knows it and he had a perfect right to cross examine on it. He didn't open the door because he knows it would prove that his man was guilty of two murders instead of one to the same jury, and I'll submit that it's a bad faith argument."
Although completely aware of the agreement, defense counsel never inquired of the subject State witness as to any bargain or deal or representations made to him by the State Attorney's office, nor did he on cross examination attempt to shake the credibility of this witness because of the plea bargain agreement mentioned on direct examination. Defense counsel, on cross examination, did not even mention the agreement that had been elicited on direct examination. As is clearly evidenced by the record, without question, defense was fully aware of the full plea bargain agreement. At the insistence of defense counsel, the deposition of Hearn was taken on January 31, 1975, at 10:20 a.m. in the Duval County Courthouse at which time Hearn testified fully to the details of the agreement thereby apprising the defense of the same.
Appellants raise several other points on appeal none of which we find to be meritorious so as to constitute reversible error.
We have listened carefully to oral argument, examined and considered the record in light of the assignments of error and briefs filed, and pursuant to Rule 6.16(b), Florida Appellate Rules, we have also reviewed the evidence to determine whether the interests of justice require a new trial, with the result that we find no reversible error is made to appear and that the evidence in the record before us does not reveal that the ends of justice require that a new trial be awarded.
Having determined that no reversible error has been made to appear which would require a new trial, we must proceed to examine whether the death sentences imposed by the trial judge were appropriate under the peculiar circumstances of this case.
The jury in these cases distinguished between the appellants in presenting their recommendations for sentence, suggesting life imprisonment for Barclay and a death penalty for Dougan. It is particularly important, therefore, that we explain our decision to uphold the recommendation of the trial judge that both be executed.
The judge before whom these cases were tried meticulously identified in writing each aggravating and mitigating circumstance listed in the death penalty statute, and he commented with specificity as to the relevance and weight to be accorded each. He noted as to Dougan that no mitigating circumstance pertained to his benefit, and that one of those factors actually suggested an aggravation rather than mitigation of sentence.[2] Dougan, who was age 27 at the time, had no significant history of prior criminal activity, was not (and did not claim to be) under a mental or emotional disturbance, was not (and did not claim to be) under duress or the dominance of another *1271 person and had (and did not deny having) full capacity both to appreciate the criminality of his conduct and to conform his conduct to law. The trial judge further found that Dougan's victim was not a participant in the episode and had not consented to the act, but that Dougan was an accomplice with four others in this crime and had a dominant, as opposed to minor role, in its accomplishment. It was Dougan who conceived and planned the events that occurred. Each of these findings is well documented in the record of Dougan's trial.
As to aggravating circumstances relative to Dougan, the trial judge recited that four factors essentially had no relevance here.[3] Four others were present to some degree, namely that Dougan's crime had created a great risk of death to many persons[4], had been committed while engaged in a kidnapping, had endeavored to disrupt governmental functions and law enforcement[5], and had been especially heinous, atrocious and cruel.[6] These findings are also well documented in the record before us. On balance, there is no doubt that the recommendation of the jury and the sentence of the trial judge are appropriate in his case.
As regards Barclay, who had received a life recommendation from the jury, virtually the same considerations apply with respect to consequences of the criminal episode. Different personal factors pertain, however. He was 23 rather than 27 years old, but had amassed a significant history of prior criminal activity. His participation, like Dougan's, was found by the trial judge not to be minor, as he was the first to assault the victim and then stab him repeatedly. The jury obviously weighed these differences somewhat differently than the trial judge.
When there is disagreement between the jury and judge after both have evaluated the same data, we have said that the jury's recommendation should generally prevail.[7] In this case, however, there is present one factor which persuades us that the judge's sentence should be upheld.[8] Two co-perpetrators who participated equally in the crime would have disparate sentences were the jury's recommendations accepted. The variation between defendants being so nominal (a minor age difference but no suggestion of different maturities), the facts here do not warrant the dispensation of unequal justice. See Messer v. State, 330 So.2d 137 (Fla. 1976); Slater v. State, 316 So.2d 539 (Fla. 1975). "Equal Justice Under Law" is carved over the doorway to the United States Supreme Court building in Washington. It would have a hollow ring in the halls of that building if the sentences in these cases were not equalized. This is a case, then, where the jury did not act reasonably in the imposition of sentence, and the trial judge properly rejected one of their recommendations.
Accordingly, the judgments and sentences of the trial court are hereby affirmed.
It is so ordered.
*1272 OVERTON, C.J., and ADKINS, ENGLAND and ROBERTS (Retired), JJ., concur.
BOYD, J., concurs specially with an opinion.
HATCHETT, J., concurs in part and dissents in part with an opinion.
BOYD, Justice, concurring specially.
The jury found both Appellants guilty of murder in the first degree, but recommended death by electrocution for Appellant Dougan and a sentence of life imprisonment without eligibility for parole during the first twenty-five years for Appellant Barclay.
A careful review of the entire record convinces me the jury was correct in recommending a higher degree of punishment for Appellant Dougan than for Appellant Barclay. Appellant Dougan was the architect of this atrocity, planned the crime and lead his karate students on the night of the murder, directed the course of the auto trip of the defendants and selected the victim to be killed. Appellant Barclay was a principal and is guilty of murder, but he was a follower who did exactly what he was told to do by Appellant Dougan and I feel that he should be granted a life sentence rather than death. Dougan fully deserves electrocution.
HATCHETT, Justice, concurring in part and dissenting in part.
The murder in this case was heinous, atrocious, cruel, and indeed, senseless.
Section 921.141, Florida Statutes (1975), "intended as it was to meet the constitutional infirmity of capital sentencing procedures explored in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), is designed to limit the unbridled exercise of judicial discretion in cases where the ultimate penalty is possible." Provence v. State, 337 So.2d 783 (Fla. 1976). In a capital case a judicial officer must evaluate the conduct of the defendant by weighing specifically enumerated aggravating and mitigating circumstances, taking into consideration prior judicial treatment of similar situations. The aggravating circumstances are limited to those listed in the statute.
The record in this case shows that the trial judge went beyond the statute and considered additional factors outside the record, including his own personal experiences, thus upsetting the balance mandated by the statute. We cannot properly perform our duty of review in capital cases and ensure uniform imposition of the death penalty if trial judges are allowed to supplement the list of factors found by the legislature to be determinative.
For this reason I would affirm the conviction and remand the case to the trial judge for the entry of sentences in accordance with Section 921.141, Florida Statutes, under the authority of Miller v. State, 332 So.2d 65 (Fla. 1976), and Messer v. State, 330 So.2d 137 (Fla. 1976).
NOTES
[1] As to Barclay, the jury recommended life by a vote of seven to five.
[2] See Section 921.141(6), Fla. Stat. (1975).
[3] Dougan was not under sentence of imprisonment, was not attempting to avoid arrest or escape custody, had not been previously convicted of a major felony, and had not acted for pecuniary gain.
[4] The trial judge noted five aborted attempts to select a victim from the streets of Jacksonville before Stephen Orlando was chosen, plus the taped threat made to white Jacksonville citizens that a race war had begun and none would be safe.
[5] The basis for this finding was the judge's observation that the notion of a race war essentially threatened the foundations of American society.
[6] Dougan's tapes explained how Stephen Orlando had begged for his life while being beaten and stabbed before Dougan "executed" him with two pistol shots in the head.
[7] Tedder v. State, 322 So.2d 908 (Fla. 1975).
[8] The trial judge here painstakingly and with reasoned judgment detailed the factors which caused his departure from the jury's recommendation. His thorough analysis is precisely the type we would expect from mature, deliberative judges in this state. It suggests why the Legislature put the trial judges of Florida in the middle of the sentencing process for capital cases.