403 So.2d 341 (1981)
Charles Dwight MESSER, Appellant,
v.
STATE of Florida, Appellee.
No. 49780.
Supreme Court of Florida.
June 4, 1981.
Rehearing Denied October 1, 1981.
*342 Theodore E. Mack, Asst. Public Defender, Tallahassee, for appellant.
Jim Smith, Atty. Gen., and Wallace E. Allbritton, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
This cause is before the Court on appeal of a sentence of death imposed for the capital felony of murder in the first degree. This Court previously affirmed the conviction for first-degree murder and robbery, but vacated the sentence of death and remanded for a new sentencing proceeding before a jury. Messer v. State, 330 So.2d 137 (Fla. 1976). A new jury was empaneled and a second sentencing proceeding was held. The trial court again sentenced appellant to death and this appeal followed.
On March 22, 1977, the Supreme Court of the United States decided Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), holding that due process is denied when the imposition of a sentence of death is based, even if only in part, on information which the defendant has no opportunity to deny or explain. Subsequently, on June 16, 1977, this Court entered an order in the instant case directing the sentencing judge to state whether he imposed the death sentence in consideration of any information not known to the appellant.
On September 26, 1977, the trial court filed a response. This Court's consideration of the appeal then continued until April 26, 1979, when we issued an opinion announcing our decision to affirm the sentence of death. Messer v. State, No. 49780 (Fla., April 26, 1979) (opinion withdrawn). On motion of the appellant for rehearing, however, based on a discrepancy between the trial court's response to our Gardner order and other documents of record, we withdrew the opinion of April 26, 1979, and, on November 8, 1979, remanded for a hearing on the question of a possible violation of the Gardner principle. Messer v. State, 384 So.2d 644 (Fla. 1979).
The trial court held a hearing for the purpose of inquiring whether the sentence of death was imposed in consideration of any information not disclosed to appellant or any reports not furnished to him prior to sentencing. A lawyer from the office of the Public Defender for the First Judicial Circuit, which office had previously represented the appellant at trial, was present, but had moved to withdraw from representation due to conflict of interest. A lawyer from the office of the Public Defender for the Second Judicial Circuit, who was serving as appointed appellate counsel, notified of the hearing, but informed the court of his view that he was without authority to represent the appellant at trial-level proceedings or outside the second circuit. The judge then ruled that there was no need for appellant to be represented at the hearing and proceeded with the inquiry.
When the findings were received by this Court, we held that the proceeding was deficient in that appellant was entitled to be represented by counsel at the hearing. On June 5, 1980, we remanded for another hearing to inquire whether the sentence of death was imposed by a judge who considered information not disclosed or reports not furnished to appellant, and directed that his appellate counsel represent him at such hearing. Messer v. State, 384 So.2d at 645 (Fla. 1980).
Another hearing on the question of a Gardner violation was held by the trial court, and we are in receipt of the transcript and the judge's written findings. The findings are reported to us as follows:
THIS CAUSE is before this court on remand from the Supreme Court of the State of Florida, opinion filed June 5, 1980, 384 So.2d 644.
The purpose of remand was for this court to conduct a further hearing to determine whether the sentence of death of the appellant was imposed in consideration of any information not disclosed to *343 the defendant or not furnished to him prior to sentencing.
At the hearing, appellant was personally present with counsel and the State of Florida was represented by the State Attorney's Office of the First Judicial Circuit, all proceedings were duly reported. The trial judge in the case recused himself because he had been subpoened [sic] by appellant's attorney as a material witness.
The hearing was heard by the undersigned circuit judge. The State of Florida called two witnesses, M.J. Livings, who is employed by the Florida Probation and Parole Office. He testified he had conducted a postsentence investigation on the defendant. The testimony reveals that he never furnished a copy of the postsentence investigation to the presiding judge and that such postsentence investigation was conducted after the first hearing but prior to the second sentencing hearing. That there were 5 copies, one went to the Executive Clemency Committee and he retained four copies; that he had never discussed the report with Judge Wells and he put a copy of the report in the file but it was not during any sentencing proceeding. He testified at the time of the original sentencing there was no presentence investigation or postsentence investigation or reports. Honorable Clyde Wells, Circuit Judge, First Judicial Circuit, was called as a witness and testified that he sentenced the defendant on two occasions; that he did not order a presentence investigation and that he never saw any reports prior to sentencing or talked to any probation officer and he had no other information prior to sentencing. He further testified that the Supreme Court requested under State v. Gardner rule, if he had any other information at the first sentencing. He originally replied there was a presentence investigation, but the mandate had come to him in Walton County his residence and he had replied without checking and had made an erroneous statement that he had a presentence investigation when in fact he did not. He testified he had not had a presentence investigation and he did not have the benefit of any other information; he never requested a presentence investigation because there was a tremendous amount of information involved in the trial of the case and he had found in many instances presentence investigations sometimes contain information that was not available to defendants. His testimony indicated if he had used a report it would have been made a part of the record. He testified that the postsentence was done before the second sentencing but he still has not used the postsentencing report.
The Court points out the postsentence referred to is in the court file and the testimony was it was conducted for the Executive Clemency Board or Commission and not at the behest of or for the court.
Based on the above, it is the opinion of this court and this court finds that the sentence of death was imposed without consideration of any information not disclosed to the appellant or reports not furnished to him prior to the sentencing.
Respectfully submitted this 2nd day of October, 1980.
Having reviewed the transcript of the hearing, we find that the court's findings are amply supported by the evidence. We also conclude that the court's report has adequately disposed of the discrepancy we noted in our order on rehearing, dated November 8, 1979. Messer v. State, 384 So.2d at 644.
Having disposed of the Gardner problem, we are now in position to review the second sentencing proceeding and consider the propriety of the sentence of death.
The facts as stated in our earlier opinion, and based on Messer's confession, were that appellant and Ronnie Brown stopped at an interstate highway rest area where they found Henry Fowler sleeping in a car. They entered the car and robbed him of his valuables, including a watch and $120.00. Then they drove the car, with the victim as *344 their captive, to several locations. Ultimately Brown struck the victim, and appellant shot him in the head. Messer v. State, 330 So.2d 137, 139 (Fla. 1976).
There were two procedural defects this Court found in the initial sentencing proceeding.
First, although there is evidence in the record of the plea-bargained second degree murder sentence received by appellant's accomplice Brown, appellant was not permitted, during the sentencing portion of the trial, to submit this evidence to the jury. We believe the jury was entitled to know that the co-defendant, Ronnie Brown, negotiated a plea of guilty to second degree murder and was sentenced to 30 years imprisonment. See Slater v. State, 316 So.2d 539 (Fla. 1975). Although the Slater case, supra, involved evidence that the "trigger man" was permitted to negotiate a plea for a sentence of life imprisonment, under the facts of this particular case we believe the reasoning of Slater applies with equal force. It was there stated, "Defendants should not be treated differently upon the same or similar facts." In the instant case, although the appellant did fire the shot into the head of the victim, this shooting occurred after Brown took a wallet containing $120 and a watch from the victim, then struck him in the back of the head. There is little to separate out the joint conduct of the co-defendants which culminated in the death of the decedent. The sentence afforded to Brown certainly is not determinative of the sentence which appellant should receive; however, the jury should have had the benefit of the consequences suffered by the accomplice in arriving at its recommendation of the sentence to be visited upon the appellant.
Additionally, we believe counsel for the defendant was effectively deprived of establishing an important mitigating circumstance when he was not afforded the opportunity to present psychiatric testimony to the jury during the sentencing portion of the proceedings. Subsection 921.141(6)(b), Florida Statutes, provides as a mitigating circumstance that "[t]he capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance." Counsel for the appellant represented to the court that, if given the opportunity, he would come forward with evidence establishing such condition. The expression by the trial court that the verdict of the jury is merely advisory and that he could consider psychiatric reports at the time he performed the actual sentencing, in our opinion, violates the legislative intent which can be gleaned from Section 921.141, Florida Statutes. It is clear that the Legislature in the enactment of Section 921.141, Florida Statutes, sought to devise a scheme of checks and balances in which the input of the jury serves as an integral part. The validity of the jury's recommendation is directly related to the information it receives to form a foundation for such recommendation. Subsection 921.141(1), Florida Statutes, provides in part:
"... In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence, and shall include matters relating to any of the aggravating or mitigating circumstances enumerated in subsections (6) [sic] and (7) [sic] [of this section]. Any such evidence which the court deems to have probative value may be received, regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements... ."
The quoted language indicates that the circuit judge should exercise the broadest latitude in admitting evidence during the sentencing portion of the jury's deliberations.
Messer v. State, 330 So.2d at 141-42.
On remand, a special jury was empaneled for the purpose of making a sentencing recommendation. At a pre-trial conference, the defense moved that the jury be apprised of the facts and circumstances of the crime by having read to them the statement of *345 facts found in this Court's opinion filed when the previous appeal was decided. The state opposed the motion, arguing that in order for the jury to be fully apprised of the circumstances, the state should be permitted to present the evidence of the crime substantially as it had been presented at the first trial. The judge stated that he wished to avoid holding the entire trial over again, but that he also felt that to read a statement of facts from this Court's opinion would be inadequate. Accordingly, the state was allowed to present evidence relating directly to the facts of the crime.
According to the testimony presented, the victim's body was found by two hunters on the morning of November 27, 1973. The body was dressed in a pull-over karate jacket and green trousers. A pathologist testified that the cause of death was a bullet wound to the brain. There was also a laceration on the back of the head indicating that the victim had been struck with a metal instrument of some kind. An officer who inspected the body at the scene testified that the cut was vertical. The pathologist who performed the autopsy testified that the laceration was horizontal and was about two inches long. The cut, according to the pathologist's testimony, went through the scalp and penetrated the muscle tissues under the scalp, but did not penetrate, nor did it fracture, the skull. This cut could have been inflicted by striking the victim with a pistol. The only part of a pistol that could have caused such a cut is the sight blade. To hold a pistol in such a way as to achieve the leverage to make such a cut, the expert said, would involve considerable awkwardness. The laceration could have been inflicted with a tire tool, as claimed in appellant's confession, but a blow with a tire tool would more likely have fractured the skull.
Witness Richard Knapp testified that he last saw his friend Henry Fowler on November 26, 1973, at Knapp's home in Semmes, Alabama, near Mobile. They had travelled together to Louisiana for the Thanksgiving holidays. After leaving Knapp at his home, Fowler was to drive on to Dothan. Knapp said that Fowler had a little over $100 on his person when he left. His car trunk contained a spare tire and some wrenches. Fowler was wearing a white karate jacket. When police recovered Fowler's car, the spare tire and tools were gone.
The state introduced in evidence a .32 caliber pistol. Lewis Hancock testified that he owns a small grocery store in Esto, Florida, about twelve miles north of Bonifay. One day in late 1973, Messer came into the store saying that he had an emergency call and had to go to Birmingham. He wanted to borrow forty or forty-five dollars and to leave as security a .32 caliber pistol resembling the one in evidence. Hancock loaned him the money, but Messer never came back for the gun. Hancock later turned the weapon over to an officer of the Florida Department of Criminal Law Enforcement.
Shawn Ingram testified that he worked as a sales clerk at the Western Auto Store in Bonifay. He had known Ronnie Brown since grammar school. On November 24, 1973, he sold a pistol to Ronnie Brown. The state presented, and Ingram identified, a written record of the firearm sale. The serial number matched the one on the pistol in evidence. Under the law regulating sales of firearms, Ingram testified, he was required to ask Brown certain questions, including whether he had ever been convicted of a crime. Ronnie Brown answered this question in the negative and Ingram said he had no reason to disbelieve him. Ingram testified further that the appellant Messer was present when Brown bought the gun.
The state and the defense stipulated that the bullet removed from the body of Henry Fowler was fired from the gun purchased by Ronnie Brown and introduced in evidence.
Curtis Golden, State Attorney for the First Judicial Circuit, was called as a witness for the state. He testified that on January 17, 1974, he went to Anniston, Alabama to interview Messer. Messer's original stated reason for consenting to the interview was to clear his conscience because he had knowledge of a murder that had *346 taken place along the interstate highway in Florida. He asked for immunity from prosecution. Golden refused, telling Messer he could not consider that until he knew what the information was.
Messer then indicated he would tell about the murder anyway. Golden advised him of his constitutional rights and proceeded with the interview. Golden asked Messer about his education level and Messer claimed he had completed two years of junior college. Golden's subsequent investigation did not include any attempt to verify this information. The initial interview was recorded on tape.
In his first statement, Messer said that he, Ronnie Brown of Bonifay, and one Ray King of Bonifay were all together when King killed Fowler. Golden testified that he was dissatisfied with this statement because of certain inconsistencies between the factual details of it and certain facts already revealed by the investigation. For example, Messer said King robbed Fowler of some $8,000 in cash of small denominations, an amount impossible to carry in the pockets of a karate jacket. So, the next day, he interviewed Messer again. Messer changed his story in certain particulars, but still maintained that the murder was committed by the man named Ray King.
Lt. Jesse Cobb, a Santa Rosa County sheriff's investigator, testified that on January 23, 1974, he was present along with Santa Rosa County Sheriff Enfinger, Sheriff Snead of Anniston, Alabama, and Mr. Ronnie Cornelius of the Florida Department of Criminal Law Enforcement, when Messer led them to the scene of the crime. This took place after Messer had already given two statements in which he said that Ray King had murdered Fowler. Messer also showed the officers the highway rest area where Fowler's car was left after the murder.
Florida state crime investigator Ronnie Cornelius testified that he participated in the investigation and went to Anniston with Mr. Golden and Lt. Cobb on January 17, 1974. On January 21, 1974, Cornelius telephoned Ronnie Brown, who was in Arlington, Texas. Cornelius told Brown that he was investigating the sabotage of county equipment in Holmes County. Cornelius had reason to know that Brown would have some awareness of the existence of such an investigation. He told Brown that he needed to talk to him in order to get the investigation "cleared up." He asked Brown whether, if the State of Florida would pay his air fare, he would be willing to return to Florida for questioning.
Brown came to Florida and was interviewed on the 21st and 22nd of January, 1974. Therefore when the investigators commenced their third interview with Messer on January 23, they had the advantage of what they had learned from Brown. A fourth and final statement was taken from Messer on the afternoon of the 23rd, following which he was placed under arrest for first-degree murder and robbery. The tape-recorded statement was played for the jury.
As was stated in this Court's opinion of March 31, 1976, Messer's final statement was that
he and Brown had been traveling on the Interstate Highway, he had been drinking liquor and beer, and they stopped at a rest area to look for toilet facilities. When they stopped, they decided to rob the victim, who was asleep in a parked car in the rest area. The pair entered the victim's car, held him up, drove him to several locations; ultimately Brown struck the victim, and appellant shot him once in the head. Brown had previously taken the victim's wallet and watch, and the pair divided $120.00 and disposed of the victim's wallet, personal effects, and car tag.
Messer v. State, 330 So.2d at 139. At the second sentencing hearing, however, the state's witnesses testified that while Brown admitted participating in the robbery and murder, in none of his statements did he admit any participation in the actual perpetration of physical violence against Henry Fowler.
Over defense objection, the court allowed the state to elicit from Curtis Golden the *347 reasons underlying his exercise of prosecutorial discretion. It was his decision to seek the death penalty against Messer while accepting Brown's plea of guilty to second-degree murder. This Court held that Messer should have been allowed to apprise the jury of this disparate treatment. On remand, the court below held that the state was entitled to present the reasons underlying the exercise of discretion that brought about this result.
Mr. Golden testified that he learned that Messer and Brown met when Messer was in jail in Bonifay, where Brown's brother-in-law worked as a juvenile counselor. Golden took into consideration that Brown had not been involved in any criminal activity until he met Messer. Golden concluded that Messer was the leader, Brown the follower in the criminal episode that led to Henry Fowler's death.
Golden testified that he believed both men participated in the abduction and robbery of Fowler, and that both were therefore equally guilty of murder in the first degree. He believed that he could have secured convictions of both men for such crime. He believed, however, that because of Brown's lower intelligence and education, he would have been able to establish mitigating circumstances, under the capital felony sentencing law, based on his subordinate role and domination by Messer. Golden believed that on this basis Brown would likely be able to secure a jury recommendation of, and sentence to, life imprisonment. The maximum penalty for second-degree murder is life imprisonment, Golden reasoned, so he decided to allow Brown to plead guilty to second-degree murder in order to spare the state the expense of a trial. No particular sentence or sentence recommendation was promised Brown in exchange for his plea. Golden said he expected Brown to be sentenced to life imprisonment.
Brown actually received a sentence of thirty years imprisonment, and the jury was apprised of this fact. The jury was informed as well that when one convicted of first-degree murder is sentenced to life imprisonment, he is not eligible to seek parole for twenty-five years, while the parole eligibility of a person sentenced to thirty years is profoundly different.
Golden testified further that with regard to Messer's case, he foresaw that the state would be able to establish several aggravating circumstances, and believed there were no mitigating circumstances. He also considered the fact that Brown admitted guilt before Messer did; Brown's cooperation and statements assisted in the solving of the crime, while Messer attempted to implicate a third, totally innocent man.
Following the state attorney's testimony about the reasons underlying his exercise of prosecutorial discretion, defense counsel moved that the court direct a verdict recommending life, and impose a life sentence. The defense based the motion on the ground that the state attorney's testimony demonstrated that he had exercised his discretion arbitrarily. A proper application of the death penalty statute, defense counsel argued, requires consistency, not arbitrary distinctions in determining the relative culpability of joint perpetrators.
The sentencing judge asked defense counsel to explain why the state attorney's exercise of discretion with regard to the case against Brown, whether it was proper or improper, had anything at all to do with the question of what sentence should be imposed upon Messer. After further argument, the court denied the motion.
The state presented the testimony of Dr. Anthony Semon, clinical psychologist. Dr. Semon examined Messer in December, 1974. He concluded that Messer was of average intelligence but that there were some indications of mental problems. His examination led him to the "hypothesis" that there may have been some impairment of the inhibitory functions of Messer's brain, but since he performed only a cursory examination rather than a "complete neurological work-up," this remained only a "hypothesis."
Dr. Semon testified that he also examined Brown. His examination of Brown was more detailed and included intelligence, *348 neuropsychological, and personality tests. The doctor concluded that Brown's intelligence was substantially below normal and that he suffered from some possible brain damage. As to personality, Dr. Semon characterized Brown as "a follower," a person who accommodates himself to the demands of others. Based on these conclusions, Dr. Semon gave his opinion that during the criminal episode Brown's capacity to understand the character of his actions was probably impaired and he was probably acting under the domination of Messer.
The state introduced a certified record from the State of Alabama showing that on October 3, 1974, Messer was convicted of manslaughter pursuant to a plea of guilty, based upon a crime that occurred on January 14, 1974.
The defense presented the testimony of Dr. Elizabeth McMahon, clinical psychologist. She testified that on May 15, 1976, she examined Messer for eight and one-half hours. She administered intelligence, neuropsychological, and behavioral tests. She had access to previous evaluations performed on Messer in 1974, including the preliminary conclusion or "hypothesis" of Dr. Semon concerning possible problems of brain functioning.
Dr. McMahon concluded that Messer evidenced a very mild pattern of cerebral dysfunctioning. What she found was indicative of a mild form of epilepsy, which, she said, is often caused by repeated trauma to the head. Dr. McMahon pointed out that this condition is not the grand mal form of epilepsy that is associated with severe seizures, but involves mild, "subclinical" seizures which cause a reduction in the efficiency of cerebral functioning.
The psychologist testified further that she concluded that Messer was an emotionally stunted person. That is, he has weak emotional controls that break down under stress. He has limited capacity to control his impulses. Dr. McMahon characterized Messer's personality type as "passive-reactive," and explained that this means he tends to react to, rather than act upon, his environment.
On cross-examination by the state, Dr. McMahon stated that Messer's problems of mental dysfunction are mild, not extreme.
On rebuttal the state presented the testimony of Dr. Theodore Marshall, a psychiatrist. He testified that he examined Messer for ninety-five minutes on December 13, 1974. The examination was performed pursuant to court order for the purpose of determining Messer's mental condition. Dr. Marshall testified that he found Messer to be coherent and that he manifested no dissociation of thinking.
After hearing the arguments of counsel, the jury deliberated and returned a verdict recommending that the court sentence Messer to death. The sentencing judge made the following findings:
FINDINGS OF FACT
Pursuant to Section 921.141(3), the Court makes the following findings of fact which constitutes the justification for the imposition of the sentence herein administered:
a. That the crime of First Degree Murder was committed while the Defendant was in the process of committing the crime of robbery (for which he has likewise been convicted).
b. That the crime was committed for pecuniary gain in that the Deceased was robbed of $120.00, and other property at the time of the commission of this offense.
c. That the murder was committed in a manner the Court finds to be especially atrocious and cruel in that the victim was taken in his automobile at gun point to two different locations, was required to get into the trunk of his automobile where he was transported, repeatedly told the Defendant he had no intentions of resisting, and finally was hit over the head and shot and left to die in the woods.
d. That by the Defendant's own statement his last 15 years were devoted to criminal behavior, but specifically finds that the Defendant was previously convicted of the crime of manslaughter.

*349 e. That the Defendant was the leader of the two co-defendants, and that the sentence received by the Defendant, Brown, (which was not passed by this Court) is not a justification for this Defendant receiving a lesser sentence.
f. The Court has reviewed those mitigating circumstances contained in Section 921.141(6)(a) through (g), and finds that none of those mitigating circumstances are present. In making this finding, the Court has considered the testimony of the two clinical psychologists and the psychiatrist who testified, none of whom diagnosed the Defendant to have been suffering any extreme mental or emotional disturbance at the time of the commission of the offense.
Based on the above findings, the Court concludes that sufficient aggravating circumstances exist to require the sentence of death in the electric chair, and that no mitigating circumstances exist which would allow this Court to reduce that sentence to life imprisonment.
Appellant contends that the court erred in allowing State Attorney Golden to testify concerning his opinion of the relative culpability and characteristics of Messer and Brown; that the Alabama manslaughter conviction should not have been admitted into evidence; that the court erred in its evaluation of the aggravating and mitigating circumstances; and that application of the death penalty to Messer is unconstitutional because it is the result of arbitrary prosecutorial discretion.
In his initial appeal of his conviction and sentence, Messer successfully maintained that he should have been allowed to tell the jury that Brown had been allowed to plead guilty to second-degree murder and had received a thirty-year sentence. Messer v. State, 330 So.2d 137 (Fla. 1976). We hold that it was within the discretion of the trial court to allow the state to explain to the jury, through the testimony of the state attorney, the reasons for the seemingly disparate treatment.
The Alabama manslaughter conviction was admissible as relevant to a statutory aggravating circumstances. See Elledge v. State, 346 So.2d 998 (Fla. 1977).
The only error we find in the judge's consideration of the circumstances of the crime is that the finding that the murder was committed in the course of a robbery and the finding that it was committed for pecuniary gain both relate to the same aspect of the crime. Provence v. State, 337 So.2d 783 (Fla. 1976), cert. denied, 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977). This error, however, was harmless. Hargrave v. State, 366 So.2d 1 (Fla. 1978), cert. denied, 444 U.S. 919, 100 S.Ct. 239, 62 L.Ed.2d 176 (1979).
Appellant's contention that the exercise of prosecutorial discretion renders the capital felony sentencing law unconstitutional as applied to his case is without merit. Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).
Having provided careful review of the sentencing trial and the court's findings, we affirm the sentence of death.
It is so ordered.
SUNDBERG, C.J., and ADKINS, BOYD, OVERTON, ENGLAND, ALDERMAN and McDONALD, JJ., concur.