Donald BEARDSLEE, Petitioner–Appellant,

v.

Jeanne S. WOODFORD, Warden, of the California State Prison at San Quentin, Respondent–Appellee.

No. 01–99007.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 10, 2002.

Filed March 20, 2003.

As Amended on Denial of Rehearing and Rehearing En Banc Jan. 28, 2004.

Steven S. Lubliner, Law Offices of Steven S. Lubliner, Petaluma, CA, for the petitioner-appellant.

Dane R. Gillette, Deputy Attorney General, San Francisco, CA, for the respondent-appellee.

Before: TASHIMA, THOMAS and PAEZ, Circuit Judges.

## AMENDED OPINION

THOMAS, Circuit Judge:

Donald Beardslee appeals from the district court's denial of his petition for habeas corpus. Juries in San Mateo County, California, convicted Beardslee on two counts of first degree murder with special circumstances and sentenced him to death. The California Supreme Court affirmed his conviction and sentence, and Beardslee filed a habeas corpus petition in federal district court. The district court rejected each of his claims and dismissed the petition. We affirm.

I

A

On April 24, 1981, Donald Beardslee returned home from work and discovered that his roommate, Rickie Soria, and a few of her friends had arranged to "get back at" Stacy Benjamin in Beardslee's apartment. Benjamin had taken drug money from William Forrester but had not delivered the drugs. Forrester, Soria, and Frank Rutherford planned to lure her to the apartment with a request for drugs and then force her to return the money. Beardslee, who had invited Soria to move in with him the previous month, was acquainted with her friends and knew of their involvement with drugs. Beardslee claimed he was especially fearful of the violent Rutherford, who brought a sawed-off shotgun to the apartment that evening.

Beardslee agreed to allow the plan to proceed in his apartment and participated in the preparations, although he claimed he did so reluctantly. After Benjamin and her friend Patty Geddling arrived, Beardslee closed the apartment door and heard the shotgun go off behind him. Rutherford had shot Geddling in the shoulder, apparently accidentally.

After explaining away the noise to his landlords, Beardslee spent several hours in the bathroom with Geddling trying to stop the bleeding, although he also left to dispose of some evidence and clean Rutherford's clothing. Eventually, Beardslee helped Geddling into a van driven by Forrester, and the three of them drove toward the coast, followed by Soria in Beardslee's car. Geddling was told she was being taken to a hospital. However, Beardslee knew she would be killed.

After driving some distance along the coast, Beardslee told Forrester to turn off the main road, and Forrester stopped the van. Beardslee then loaded the shotgun and handed it to Forrester, who shot Geddling twice. After feeling Geddling's wrist, Beardslee returned to the car, reloaded the gun, and shot Geddling twice. Beardslee initially admitted shooting Geddling to put her out of her misery. He later claimed he thought she was already dead and had merely pretended to shoot her in order to demonstrate his involve-

ment and impress Rutherford. Forensic evidence strongly suggested that Beardslee's shots had been to Geddling's head and had actually killed her.

Beardslee and Soria dropped Forrester off and went to Rutherford's place, where Benjamin was still being held. They told Benjamin that Geddling had been taken to a hospital. Shortly thereafter, Beardslee drove the four of them north to Marin County. They stopped on a deserted road. Beardslee and Soria wandered a short distance off after Rutherford had coaxed Benjamin from the car. Beardslee returned to find Rutherford strangling Benjamin with a wire. He thought he noticed a "pleading look" on her face and unsuccessfully tried to knock her out with a punch. He briefly took one end of the wire from Rutherford. After helping Rutherford drag Benjamin's body though the brush, Beardslee asked for Rutherford's knife, which he used to slit Benjamin's throat. Beardslee initially claimed he wanted to end her suffering. He later claimed he thought she was already dead when he cut her throat and was only acting out of fear of Rutherford. Forensic evidence strongly suggested that Benjamin died from the knife wound.

Geddling's body was discovered the next day, and police found Beardslee's phone number in Geddling's pocket. Beardslee initially denied any connection to Geddling. However, the next day he provided a detailed account and led the police to all the relevant evidence, including Benjamin's body.

## B

Beardslee made a formal statement to police on April 26, 1981, and he was charged with both homicides on May 3. He had already told police he was on parole from a prior homicide in Missouri, and he was also charged with the special circumstance of a previous murder conviction.

Douglas Gray, Beardslee's appointed counsel, felt Beardslee's prior homicide and complete confession put him in grave danger of the death penalty. Thus, he agreed to have Beardslee cooperate fully with the authorities against his co-defendants in order to generate mitigation at the penalty phase of the trial. Beardslee claims that Gray failed to inform him of Gray's intention to forgo the guilt phase.

Beardslee submitted to a lengthy interrogation by investigators on January 2, 1982. In late January, he testified as a prosecution witness at the preliminary hearing for Frank Rutherford. He later testified at a hearing for William Forrester. On several occasions, he answered extended questions about his own involvement in the California killings as well as questions about his prior homicide. According to his testimony, Beardslee met Laura Griffin in a Missouri bar in 1969 and accompanied her home. At some point in the evening he felt insulted. As a result, he eventually held Griffin's head underwater and stabbed her in the throat. Beardslee claimed he could not remember much about that night because he had been drinking.

Shortly after the Griffin murder, Beardslee confessed his involvement to a girlfriend, who referred him to clergy and eventually to a lawyer. His attorney took him to a county hospital for psychiatric counseling, instructing police officers not to question him. After the attorney had departed, the detectives engaged Beardslee in conversation about the killing and used the information they acquired to gather sufficient evidence about the crime. Beardslee's lawyer moved to suppress all evidence obtained as a result of this interrogation. However, the officer involved, Jack Patty, testified that he had obtained all relevant evidence from other sources. Beardslee's motion was denied.

The California prosecutor, Carl Holm, considered introducing this prior homicide as a special circumstance in the California case, and he sent two detectives to Missouri to gather additional evidence. When their report raised serious questions about constitutional violations by the Missouri officers, Holm called Officer Patty and secretly recorded an extended conversation about the case. Patty admitted that he had talked to Beardslee despite his lawyer's instructions, that he had obtained evidence as a direct result of the conversation, and that he lied about these facts at Beardslee's 1970 suppression hearing. Holm disclosed this information to defense counsel and decided not to introduce the conviction as evidence. However, Holm still planned to introduce both forensic evidence from the Missouri crime scene and Beardslee's confession of that killing from the Rutherford preliminary hearing.

As had been informally arranged between Gray and Holm, Beardslee's co-defendants were tried first. Soria pled guilty to second degree murder and received fifteen years. Forrester was acquitted of the Geddling killing. Rutherford was found guilty of first degree murder for the Benjamin killing and received a sentence of life without parole.

Contrary to Gray's expectations, on the eve of trial Beardslee insisted on going through with both the guilt and penalty phases. Beardslee later testified that he always "took it for granted" there would be a guilt phase. In an emergency motion to substitute counsel, Gray argued that he couldn't continue because he had spent the previous twenty-one months helping to generate evidence that would show mitigation but that also solidified Beardslee's guilt. Both Gray and Beardslee agreed that Beardslee would be satisfied to have Gray continue as counsel in the guilt phase, though Beardslee later challenged Gray's assistance as ineffective. The trial court allowed the substitution of counsel and also granted a continuance so that Beardslee's new counsel, John Balliet, could prepare for trial.

## C

On October 18, 1983, a San Mateo county jury convicted Beardslee of two counts of first degree murder. The prosecutor had argued that the women were killed because they both had witnessed the shooting in Beardslee's apartment. The jury found the special circumstances of multiple murders and witness killing to be true for each homicide. Prior to the penalty phase, the trial court rejected a defense motion to exclude evidence relating to the Missouri killing after a lengthy hearing. At the penalty phase, extended excerpts from the Rutherford preliminary hearing were read into the record. On January 23, 1984, a second jury sentenced Beardslee to death for the murder of Patty Geddling and to life in prison for the murder of Stacy Benjamin. The trial court denied all post-conviction motions.

On direct appeal, the California Supreme Court affirmed Beardslee's conviction and sentence, but overturned the two witness killing special circumstances and one of the multiple murder circumstances. *People v. Beardslee*, 53 Cal.3d 68, 279 Cal. Rptr. 276, 806 P.2d 1311 (1991). Two dissenting judges stated that the prior homicide should not have been admitted and would have reversed the death sentence. *Id.* at 118, 279 Cal.Rptr. at 305, 806 P.2d at 1340 (Mosk, J, dissenting); *id.* at 120, 279 Cal.Rptr. at 306, 806 P.2d at 1341 (Broussard, J., dissenting). The court simultaneously dismissed Beardslee's first state habeas petition.

Beardslee applied for federal habeas counsel in September 1992 and filed his first federal petition on July 10, 1995. The

federal district court stayed proceedings until the California Supreme Court rejected Beardslee's second habeas petition in July 1996, exhausting all remaining state claims. Beardslee then filed an amended federal habeas petition that December raising 67 claims. The district court dismissed nine claims as barred by *Teague v. Lane,* 490 U.S. 1031, 109 S.Ct. 1771, 104 L.Ed.2d 206 (1989). On May 10, 1999, the court granted summary judgment to the State on an additional 31 claims that did not include an evidentiary hearing request. On November 3, the court granted Beardslee's request for an evidentiary hearing on nine of the remaining claims and dismissed the rest. The district court held a three-day evidentiary hearing in September 2000. On February 16, 2001, the court granted summary judgment to Woodford (hereinafter "the State") on all remaining claims. Beardslee's various post-judgment motions were denied on April 12, 2001, and he filed a timely notice of appeal.

We review *de novo* a district court's denial of a habeas petition under 28 U.S.C. § 2254. *Smith v. Stewart,* 140 F.3d 1263, 1268 (9th Cir.1998), *cert. denied,* 525 U.S. 929, 119 S.Ct. 336, 142 L.Ed.2d 277 (1998). Because the petition for habeas corpus was filed before AEDPA's effective date, pre-AEDPA rules govern the petition. *Lindh v. Murphy,* 521 U.S. 320, 326, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). However, because the appeal was filed after the effective date, the right to appeal itself, including Certificate of Appealability requirements, is governed by AEDPA. *Slack v. McDaniel,* 529 U.S. 473, 480–82, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000).

## II

On appeal, Beardslee first raises several claims relating to the period between his arrest and the start of his trial, largely centering around his extensive cooperation with law enforcement officials and the ineffective assistance of his first trial counsel in shaping that cooperation.

### A

Beardslee challenges the pre-trial assistance of Douglas Gray on two separate grounds. First, he asserts that Gray failed to object to extensive questioning about the prior Missouri homicide at Rutherford's preliminary hearing. At Beardslee's later penalty phase trial, the prosecutor introduced transcripts of this testimony into the record, where it proved critical in establishing Beardslee's involvement with the Missouri crime. Second, Beardslee argues that Gray failed to communicate his intention to concede the guilt phase of the trial and work solely toward developing mitigation through extensive cooperation with the authorities. Beardslee contends that if Gray communicated this intention, Beardslee would have rejected this strategy. Thus, he would have refrained from cooperating as fully with the investigators, limiting his ultimately damaging statements and testimony.

The district court dismissed both of these claims following an evidentiary hearing. The court found that the overall strategy to cooperate with the authorities and generate mitigation was reasonable and that Gray's failure to object during the preliminary hearing reflected this strategy. Furthermore, although Beardslee claimed that it had been Gray's idea to testify for the prosecution, the district court found that the decision had been Beardslee's. Based on the record and observations of Beardslee's demeanor, the court found Beardslee's testimony to be "incredible, untrustworthy and unsupported by Petitioner's history and record" and concluded that "it was Petitioner's idea, and not Gray's, to cooperate in the prosecution of, and to testify against, the co-

defendants." The court also held that Beardslee had suffered no prejudice, since at the time of his testimony nobody knew the Missouri conviction had been tainted, and that the penalty phase jury would have been informed about Beardslee's involvement through other means. The court added that, even assuming the decision to concede the guilt phase had been taken without proper client consultation, Beardslee could not show prejudice because he ultimately received a guilt phase trial.

■ Ineffective assistance of counsel claims are mixed questions of law and fact which we review *de novo*. *United States v. Alvarez–Tautimez*, 160 F.3d 573, 575 (9th Cir.1998). We review findings of fact made by the district court relevant to the denial of a habeas corpus petition for clear error. *Bonin v. Calderon*, 59 F.3d 815, 823 (9th Cir.1995). In order to succeed on a challenge to the effective assistance of counsel, Beardslee must demonstrate (1) that counsel's performance fell below an objective standard of reasonableness and (2) that counsel's defective performance actually prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under the performance prong, the relevant question is not what counsel might have done, but whether counsel's decisions were reasonable from his or her perspective at the time, starting from the "strong presumption that counsel's conduct falls within the wide range of reasonable conduct." *Id.* at 690, 104 S.Ct. 2052. Under the prejudice prong, Beardslee must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052.

Beardslee testified as a prosecution witness at Frank Rutherford's preliminary hearing. He faced sustained questioning from Rutherford's attorneys on his role in both the California homicides and the prior homicide in Missouri. Despite raising doubts about their relevance, Beardslee answered these questions and admitted that he held Griffin's head under water in order to kill her and later stabbed her in the throat. This testimony, among other passages, was read into the record at Beardslee's penalty phase trial. John Balliet, Beardslee's subsequent counsel who witnessed the testimony, testified that Rutherford's attorneys were jubilant about their extended cross-examination of Beardslee.

Beardslee attacks Gray's performance at the Rutherford preliminary hearing, arguing that Gray failed even to pay attention during Beardslee's testimony, concentrating instead on his collection of *Bon Appetit* magazines. At an evidentiary hearing before the district court, Beardslee's "*Strickland* expert" testified that Gray's failure to object to the questioning fell below an objectively reasonable level of legal assistance. Beardslee also contends that Gray was ignorant of Beardslee's Fifth Amendment rights at the Rutherford preliminary hearing, citing Gray's argument in a later motion to continue the guilt phase trial.

The State responds that Gray's conduct, while not exemplary, was plausibly tied to his overall strategy of generating mitigation through cooperation, including testimony against Beardslee's co-defendants. The prosecutor later testified that in exchange for Beardslee's cooperation, the government agreed to try him last so that he could present his record of cooperation to the penalty phase jury. Moreover, regardless of the exact scope of a Fifth Amendment privilege available to a cooperating witness, Gray was aware that he could instruct his client not to answer questions and chose not to do so. All parties agree that he was trying to gener-

ate mitigation by demonstrating cooperation with the authorities, and that objections or instructions may have undermined his trial strategy. On cross-examination, even Beardslee's *Strickland* expert admitted that an assertion of a Fifth Amendment privilege might have led to the exclusion of Beardslee's testimony.

■ Recognizing that Gray's behavior might be labeled a tactical decision, Beardslee also claims that the decision to cooperate with the authorities, even if a conscious strategy to generate mitigation, was both completely uninformed and so unreasonable as to be constitutionally deficient. As Beardslee points out, counsel has an obligation to conduct a thorough investigation into the client's background. *Williams v. Taylor*, 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). However, counsel may also choose not to pursue a particular investigation if such a choice is reasonable. *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052, 80 L.Ed.2d 674 ("a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments"). In this case, Gray was faced with a client who had freely confessed extensive involvement with two homicides prior to Gray's involvement in the case. The client's criminal record indisputably contained a facially legitimate prior first degree murder conviction. Given Beardslee's ready admission that he had, in fact, committed the prior murder, Gray's decision not to investigate that crime was objectively reasonable.[1]

■ Beardslee insists that the strategic choice to offer complete cooperation was so misguided that it cannot be constitutionally permissible, largely because it almost al-

ways leads to a conviction and death sentence. However, the judge hearing the motion to substitute counsel said he would have adopted the same strategy. In fact, counsel in *Strickland* faced a similar dilemma and, in effect, made a similar choice. 466 U.S. at 672–74, 104 S.Ct. 2052, 80 L.Ed.2d 674. Although in hindsight some other strategy may have been preferable, Gray may have reasonably concluded he had little other choice.

Nonetheless, the reasonableness of this decision depends in part upon Gray's awareness of other strategic options, and his failure to conduct a wider investigation raises serious questions about his representation. Beardslee claims that, rather than cooperate with the authorities, Gray could have presented a traditional case in mitigation that centered on Beardslee's difficult family history and psychological state. Beardslee claims that Gray rarely visited him, never had him evaluated by a psychiatrist, and never investigated his family background. The record provides considerable support for the argument that Gray did not conduct a thorough investigation into Beardslee's background and mental state, nor did he make a conscious decision to curtail an incipient investigation. We agree that this level of investigation fell below constitutionally acceptable standards, and Gray could not reasonably have chosen to eschew further mitigation research or select cooperation instead of mitigation. *See Wiggins v. Smith*, 539 U.S. 510, ——, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003) ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."); *Mayfield v. Woodford*, 270 F.3d

---

1. Beardslee argues strongly that Gray had a duty to investigate the prior homicide regardless of what Beardslee told him, and his *Strickland* expert testified to that effect.

However, on cross-examination, he admitted that examination of police and medical records might be sufficient.

915, 927 (9th Cir.2001) ("Judicial deference to counsel is predicated on counsel's performance of sufficient investigation and preparation to make reasonably informed, reasonably sound judgments.").

However, Beardslee cannot show that Gray's failure to investigate potential mitigation strategies actually prejudiced his penalty phase trial, as he must under *Strickland*. First, the record does not support Beardslee's argument that Gray made an explicit choice between cooperation and mitigation. Gray's decision to encourage full cooperation with the authorities did not preclude further mitigation research, nor did his insufficient investigation into Beardslee's background necessarily lead him to encourage more cooperation than he otherwise would have. Although Gray's strategy precluded a guilt phase defense, full cooperation and a substantial case in mitigation are actually quite compatible, as demonstrated by Beardslee's subsequent counsel.

Second, despite his claims to the contrary, Beardslee played a significant role in choosing and shaping the overall cooperation strategy. He argues that Gray never communicated his plan to concede the guilt phase nor explained the consequences of cooperation, but the district court found that the strategy was Beardslee's own choice, a factual finding we review for clear error. *Bonin*, 59 F.3d at 823. Beardslee provided an extensive statement to detectives about his involvement in the California killings on April 26, 1981, long before Gray was even appointed counsel.

In a January 1982 interview with the police, Beardslee agreed that the decision to cooperate was his, that he had authorized Gray to contact Holm, and that he was aware that any testimony could be used against him later in both the guilt and penalty phase trials.[2] Gray testified that after "substantial discussions" with Beardslee, and consideration of the prior homicide, he concluded that cooperation offered Beardslee the best chance of avoiding the death penalty. Combined with the district court's observations about Beardslee's credibility and demeanor, the record does not support a conclusion that the district court erred in finding that the cooperation tactic originated with Beardslee.[3]

Third, the record does not support Beardslee's contention that the introduction of evidence about the Missouri homicide depended upon Gray's failure to investigate other mitigation options. Granted, the Missouri homicide was almost certainly critical to the penalty phase outcome. *See Beardslee*, 53 Cal.3d at 112, 279 Cal.Rptr. at 301, 806 P.2d at 1336(dismissing *Davenport* error as harmless because of the prior homicide); *id.* at 118–19, 279 Cal.Rptr. at 305–06, 806 P.2d at 1340–41 (Mosk, J., dissenting) (stressing the importance of the prior homicide to the outcome). However, at the time of the Rutherford hearing, competent counsel would not have recognized the importance of excluding detailed information about this homicide.[4] Moreover, competent counsel probably could not have excluded all mention of the Missouri homi-

---

2. Beardslee merely answered "yes" to questions posed along these lines.

3. This finding also defeats Beardslee's separate claim that Gray failed to communicate his legal strategy.

4. Patty only admitted his illegal conduct months later in a secretly recorded telephone conversation with the California prosecutor about the Missouri investigation. Given the apparently valid conviction and Beardslee's ready confession to the prior homicide, competent defense counsel would not necessarily have discovered (or even investigated) this information.

cide from the trial. Beardslee disagrees, arguing that without his admissions at the Rutherford trial, "the prosecution would not have been able to prove that he committed the Missouri murder." The record belies this assertion.

The police knew about Beardslee's involvement with the Missouri homicide before Gray was ever appointed counsel. When the police arrived at his door on the day after the killings, he told them he was on parole. During the more extensive testimony on January 2, Beardslee told officers that he had stabbed Laura Griffin in Missouri. Although Gray stopped the questioning after a few minutes, this admission was already on the record before the Rutherford preliminary hearing. Even if Gray had instructed Beardslee to refrain from answering particular questions about the physical details of the crime, the trial judge might not have excluded all reference to the prior homicide. Armed with Beardslee's admission of guilt, prosecutors could have filled in additional details with forensic evidence about the nature of the crime. Psychological experts and doctors who interviewed Beardslee in Missouri and California had significant information about Beardslee's participation in the Missouri killing.[5] Given the abundance of information about his involvement in the prior homicide, Beardslee cannot

demonstrate that counsel's decision to allow him to testify about a crime he had already admitted committing had a substantial impact on the verdict.

Fourth, Beardslee received, at his own request, new trial counsel as well as a seven-month continuance to allow adequate preparation. Balliet conducted a reasonably thorough investigation into Beardslee's background and presented both a guilt phase defense and a substantial case in mitigation. With the exception of claims relating to Balliet's preparation of psychological experts and his failure to object to a prosecutorial argument in the penalty phase, Balliet's performance is not at issue on appeal. Unlike the typical ineffective assistance claimant, therefore, Beardslee eventually received trial counsel who conducted the type of investigation his prior counsel should have conducted in order to provide effective assistance in the first place.[6]

After careful review of the record before us, we conclude that Beardslee cannot make the requisite showing of prejudice under *Strickland.*

## B

■ Beardslee also claims that he is entitled to an evidentiary hearing on whether Prosecutor Carl Holm encouraged

---

5. Beardslee claims that he would not have offered psychological expert testimony in the penalty phase if it meant keeping out all evidence of his involvement in the Missouri killing.

6. In effect, Beardslee argues that Gray's initial failure to investigate potential mitigation defenses foreclosed the possibility of a fair penalty phase trial, regardless of the sufficiency of any subsequent investigation or case in mitigation. When Balliet became counsel, Beardslee's Rutherford testimony and other statements were already part of the public record, available to the prosecution in the absence of a court order to the contrary.

This evidence would also be available to the prosecution if we ordered a new penalty phase trial. Unless Beardslee prevails on his separate claim to exclude all evidence of the prior murder, something he cannot do as we discuss below, any newly appointed counsel would be in the same position as Balliet. Thus, a new trial would not necessarily remedy the constitutional violation alleged in this case. Because we find that Beardslee cannot demonstrate prejudice on the facts of this case, we need not decide whether situations may arise in which counsel provides assistance so ineffective that any later representation is irrevocably prejudiced.

him to waive his constitutional rights and testify against his co-defendants while his attorney was not present. According to Beardslee, Holm approached him during a bathroom break and asked him if would be willing to testify. Although Holm made no explicit promise, Beardslee understood this to be an implicit promise for fair treatment.

Before the guilt phase trial began, Beardslee's new counsel moved to exclude all of Beardslee's testimony against his co-defendants based on the improper conduct between the prosecutor and the defendant. At a hearing on the motion, Holm remembered being in the bathroom at the same time as Beardslee but only dimly recalled the conversation. When Beardslee would not testify that the prosecutor's offer was the *only* reason for his cooperation, the trial court excluded evidence about the bathroom conversation as irrelevant and denied the defendant's motion.

Beardslee moved for an evidentiary hearing, offering to testify that the prosecutor brought up the subject, that Beardslee understood the conversation as an offer of fair treatment in exchange for testimony, and that the conversation played a material part in his decision to testify. The district court denied the motion and granted summary judgment to the State, holding that Beardslee failed to allege facts sufficient to entitle him to relief. The court also found that the state trial court reliably found the relevant facts after a full and fair hearing.

▌ A district court denial of an evidentiary hearing is reviewed for abuse of discretion. *Tapia v. Roe,* 189 F.3d 1052, 1056 (9th Cir.1999).[7] In this case, the district

court's decision is amply justified by the evidence, because Beardslee's version of events, even if correct, would not entitle him to relief. Prosecutorial misconduct would only entitle Beardslee to a new trial if it resulted in a fundamental denial of due process. *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). As Beardslee argues, "eliciting information from a defendant outside the presence of his counsel" may constitute misconduct, *Massiah v. United States,* 377 U.S. 201, 204, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), but this refers to the actual extraction of information, not the vague encouragement to reveal such information in the presence of an attorney. Beardslee only revealed actual information in the presence of his attorney, and only after he had been asked if he understood the consequences of his actions. At the preguilt phase hearing, defense counsel admitted that Beardslee had multiple motives for cooperating, further undermining the argument that the prosecutor's actions made the trial fundamentally unfair.

Given that the state court held a full evidentiary hearing and the unlikelihood that Beardslee can meet the prosecutorial misconduct standard, we affirm the district court denial of an evidentiary hearing.

### III

Beardslee raises four claims relating to guilt phase jury instructions and the trial court's responses to juror inquiries. In order to prevail on any of these claims, Beardslee must demonstrate that the court's error so infected the entire trial that the resulting conviction violates due

---

7. In addition, Beardslee's refusal to testify at the state evidentiary hearing may imply that he failed to develop fully the state court record, creating a higher bar to an evidentiary hearing even in the days before AEDPA. *Kee-* *ney v. Tamayo–Reyes,* 504 U.S. 1, 11, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992), *superceded by statute as stated in Williams,* 529 U.S. at 432–34, 120 S.Ct. 1479.

process. *Estelle v. McGuire*, 502 U.S. 62, 71–72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Concretely, Beardslee must show a "reasonable likelihood" that the jury applied the instruction in a way that violated the Constitution. *Ficklin v. Hatcher*, 177 F.3d 1147, 1150–51 (9th Cir.1999). Each of Beardslee's claims falls short of this standard.

A

Beardslee raises two separate claims stemming from the trial court's response to a jury note requesting clarification of murder instructions. Beardslee argues that both the specific refusal to clarify a pivotal murder instruction and the broader implication that the jury could not ask for any other clarification violated his constitutional rights.

On the afternoon of October 18, near the end of the first day of deliberation, the jury submitted a brief note asking whether "the first degree murder" referred to "the act as a whole or the defendant's participation in said act." After dismissing the jury for the evening, the judge informed trial counsel of the note and told them he would not offer any further explanations, remarking bluntly that "they either get it figured out for themselves or not."[8] Neither attorney offered any comment, and the following morning, the judge told the jury:

Ladies and Gentlemen, also in addition to your request concerning an instruction, there is and can be no explanation of the instructions. You just have to work them out as they are printed.... You are going to have to consider the instructions as a whole, as one of those instructions will be and did advise you, some of the instructions will apply, some

of the instructions will not. All of those instructions have to be considered as a whole. Do the best you can with them.

That afternoon, the jury delivered its guilty verdict.

The California Supreme Court held that the trial court violated California Penal Code § 1138, which requires a judge to respond to a jury's request for information on a point of law. *Beardslee*, 53 Cal.3d at 96–97, 279 Cal.Rptr. at 290–91, 806 P.2d at 1325–26. However, the state supreme court also inferred that the jury was contemplating the role of an aider and abettor relative to the deliberate and premeditated murder instruction, and both parties agreed the latter instruction had prompted the note. *Id.* at 96, 279 Cal.Rptr. at 290, 806 P.2d at 1325. If the trial court's failure to answer the question meant that the jury erroneously imported additional premeditation requirements into the aiding and abetting instruction, the prosecutor would have been the only party prejudiced. As a result, the court held that the lack of clarification could not have prejudiced the defendant and declared the error harmless. *Id.* at 97–98, 279 Cal.Rptr. at 291–92, 806 P.2d at 1326–27. The court also dismissed the claim that the instruction had discouraged additional questions as "speculation, not proof of prejudice." *Id.* at 98, 279 Cal.Rptr. at 291, 806 P.2d at 1326. The district court agreed that the error was harmless and granted summary judgement to the State on both claims.

On appeal, Beardslee argues that the failure to clarify jury instructions rises to the level of a federal constitutional violation, citing *Bollenbach v. United States*, 326 U.S. 607, 612, 66 S.Ct. 402, 90 L.Ed. 350 (1946) ("When a jury makes explicit its

---

8. By way of explanation, the judge added: "Every time a Judge opens his big mouth and tries to explain what an instruction means, he puts his foot in it and the Appellate Court promptly bites it off."

difficulties a trial judge should clear them away with concrete accuracy."). The State responds both that the Beardslee jury never made its difficulties explicit and that *Bollenbach* involved a patently erroneous instruction. The State further cites *Weeks v. Angelone*, 528 U.S. 225, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000), in which the Supreme Court rejected a challenge to a judge's failure to clarify instructions. The Court noted that the original instruction was correct and that the judge directed the jury to the precise paragraph that answered the question clearly. This was sufficient to pass constitutional muster, given the presumption that the jury follows instructions and the additional empirical factors strengthening that presumption in the case at hand. *Id.* at 234, 120 S.Ct. 727.

▮ In Beardslee's case, however, the trial court's action was clearly in error. The judge responded to a specific jury request with a command to "do the best that you can," coupled with the implication that no further clarification would be forthcoming. Given the categorical nature of the admonition that there "is and can be no explanation of the instructions," we disagree with the district court's conclusion that "the jury was not precluded from asking additional questions if it so desired." The trial court's response violated Beardslee's due process rights to a fair trial. However, because Beardslee failed to demonstrate any prejudice, the error was harmless.

▮ Beardslee argues that the harm was structural, making a specific showing of prejudice unnecessary. Nonetheless, in the usual case, harmless error analysis is appropriate in considering a claim that the trial court failed to clarify instructions. The Supreme Court has limited the number of constitutional errors in habeas cases that are exempt from harmless error review. *See Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (listing three exceptions to harmless error review); *Arizona v. Fulminante*, 499 U.S. 279, 306–307, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (offering many examples of harmless error review). The two cases cited by Beardslee for structural error involve considerably different situations: *Sullivan* involved an unconstitutional instruction that lowered the reasonable doubt standard, while *People v. Gainer*, 19 Cal.3d 835, 139 Cal.Rptr. 861, 566 P.2d 997 (1977), involved an instruction to a deadlocked jury that forced the minority to consider impermissible factors in reaching a verdict (namely, the majority's views). In both cases, the trial court actively contributed faulty legal analysis that directly affected how the jury should reach its verdict, making any subsequent analysis of that verdict extremely difficult. Beardslee argues that failure to eliminate juror confusion and refusal to allow future jury questions makes the verdict itself similarly unreliable. However, we have only found reversible error in the failure to issue supplementary instructions when the jury expressed actual confusion about the law. In *McDowell v. Calderon*, 130 F.3d 833, 837–38 (9th Cir.1997) (en banc), we reversed a death sentence in large part because the jurors' note demonstrated that eleven jurors erroneously believed they could not consider certain mitigating factors, when, in fact, they were obligated to consider them. *See also United States v. Warren*, 984 F.2d 325, 329–30 (9th Cir.1993) (overturning a conviction on direct review because a juror note demonstrated confusion over premeditation instructions). Beardslee, in contrast, offers no real basis for inferring that the jury misinterpreted the law or the instructions. Given the absence of prejudice, the district court properly granted summary judgment.

## B

■ Beardslee next claims that the trial court failed to instruct the jury on the lesser-included, non-capital offense of manslaughter, which was supported by the defense theory of imperfect duress. Beardslee argues that a jury in a capital case must be able to consider whether the defendant is guilty of a lesser-included, non-capital offense when the evidence supports such a verdict. *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). Here, the jury was instructed that they could also consider second degree murder or first degree murder without special circumstances. Beardslee argues that both of these charges require express malice. Under his theory of the case, he lacked express malice because he only acted out of extreme fear of Rutherford, whether or not that fear was reasonable. Therefore, if the jury believed Beardslee's defense, they would have no choice but to acquit completely. This result would offend *Beck's* underlying rationale that juries must be given something other than an all-or-nothing choice when it is undisputed that a crime has been committed. *Id.* at 637, 100 S.Ct. 2382. At trial, Beardslee's counsel raised precisely this argument, which was rejected after lengthy argument by both sides.

The California Supreme Court also rebuffed this claim on appeal, noting that the trial court gave numerous instructions that allowed the jury to consider the effect of threats upon Beardslee's mental state, both as an absolute defense to all charges and as a factor in choosing between first and second degree murder. *Beardslee*, 53 Cal.3d at 85–87, 279 Cal.Rptr. at 282–85, 806 P.2d at 1317–20. The district court agreed with this reasoning. Both courts found that the jury's decision to reject second degree murder meant that they would not have accepted the lesser charge of manslaughter, rendering any instructive error harmless.

Beardslee argues that despite the second degree murder instruction, he was entitled to an instruction on manslaughter. He claims that all viable lesser-included charges must be instructed, and under a theory of imperfect duress, a jury may have agreed that he held an honest, if unreasonable, fear of Rutherford. However, none of the cases on imperfect duress suggests that his theory is viable. Rather, the relevant California cases have involved imperfect *self-defense*, in which the defendant alleged he honestly, but unreasonably, believed he was in danger *from the person he killed*. See *People v. McCoy*, 25 Cal.4th 1111, 1115–16, 108 Cal.Rptr.2d 188, 190–92, 24 P.3d 1210, 1212–13 (2001); *People v. McKelvy*, 194 Cal.App.3d 694, 701, 239 Cal.Rptr. 782 (1987); *People v. Flannel*, 25 Cal.3d 668, 674–75, 160 Cal.Rptr. 84, 86–87, 603 P.2d 1, 3–4 (1979); *see also People v. Uriarte*, 223 Cal.App.3d 192, 197–98, 272 Cal.Rptr. 693 (1990) (acknowledging that a related honest-but-unreasonable belief may under some circumstances reduce murder to manslaughter, but observing that the defendant must believe serious injury was imminent and that lethal force was necessary). Beardslee was not acting in self-defense when he acted, and any ostensible threat from Rutherford was not imminent.

■ Moreover, contrary to Beardslee's claim, jury instructions are not required as to all possible lesser-included offenses. For example, in *Murtishaw v. Woodford*, 255 F.3d 926, 955 (9th Cir.2001), the case upon which Beardslee relies, we did not require an imperfect self-defense instruction because the jury was presented with other lesser-included options. Although these options included both second degree murder and manslaughter, the primary consideration in *Murtishaw* was avoiding

the type of all-or-nothing situation at issue in *Beck*.

In sum, the district court properly granted summary judgment on this claim. Although the trial court rejected the defense request to instruct on manslaughter, the state trial court included several instructions indicating the relevance of perceived threats to Beardslee's life for the question of first or second degree murder. The trial court advised the jury that if the defendant had "an honestly held belief that his life was in peril and as a result did not maturely and meaningfully premeditate, deliberate and reflect on the gravity of his contemplated act or form an intent to kill, you can not find him guilty of a willful, deliberate and premeditated murder." In his closing argument, defense counsel explicitly called the jury's attention to the possibility of a second degree murder verdict as a way of finding Beardslee less responsible than some of the others and of dealing with the fear Beardslee had for his life without absolving him of the crime. In this context, the jury had more than the simple all-or-nothing choice at issue in *Beck*.

We also note that even if a manslaughter instruction were required under *Beck*, Beardslee would have to demonstrate that the violation had a substantial and injurious effect on the jury's deliberation and verdict. *Ghent v. Woodford*, 279 F.3d 1121, 1134 (9th Cir.2002); *Morris v. Woodford*, 273 F.3d 826, 833 (9th Cir.2001). Taking the jury instructions as a whole, Beardslee cannot demonstrate either constitutional error or any resulting harm.

### C

■ Beardslee also claims that the trial court's erroneous instruction that a mis-

take of fact had to be honest *and* reasonable undermined one of his key defenses. Beardslee's counsel argued that he honestly, but perhaps unreasonably, believed that both women were already dead when he administered the fatal blows. The trial court orally instructed the jury that "a person is not guilty of a crime if he commits an act or omits to act under an honest or reasonable belief that in the existence of certain facts and circumstances which, if true, would make such an act or omission lawful." However, the written instructions submitted to the jury substituted "honest *and* reasonable belief" for "honest *or* reasonable belief" (emphasis added).[9] Beardslee claims that this negated his theory of unreasonable mistake of fact.

The district court granted summary judgment to the State, finding that the defense theory was fully explained to the jury. The court also noted that even under Beardslee's theory of the case, he drove with each woman to the crime scene knowing that his co-defendants intended to kill them. He also actively participated in each woman's death before he actually administered the final blow, loading the shotgun that Forrester used to shoot Geddling and helping Rutherford to strangle Benjamin. As a result, the jury could have convicted Beardslee of first degree murder even without considering the final, fatal blows. The California Supreme Court rejected this claim for similar reasons. *Beardslee*, 53 Cal.3d at 87–88, 279 Cal. Rptr. at 284–85, 806 P.2d at 1319–20 (1991).

■ Failure to instruct on the defense theory of the case is reversible error if the theory is legally sound and evidence in the case makes it applicable. *United States v. Scott*, 789 F.2d 795 (9th Cir.1986). Beard-

---

**9.** The written instructions conformed to CALJIC instruction 4.35 at the time of the trial. In subsequent years they were changed to delete "and reasonable."

slee argues that any such error is per se reversible, citing *United States v. Escobar de Bright*, 742 F.2d 1196, 1201–02 (9th Cir.1984). In that case, an undercover drug sting operation led to a conspiracy conviction after the trial court refused to instruct the jury that the defendant could not be found guilty if she only "conspired" with the undercover government agent. Reversing, we both agreed with her legal argument and noted that the evidence supported her claim that she had little contact with the other supposed conspirators.

Several important distinctions separate *Escobar* from the case at hand. First, the trial court in *Escobar* explicitly refused a requested instruction and directly undermined the principal defense argument. Here, the "failure to instruct" is less obvious. The record indicates only that the prosecution and defense agreed upon CALJIC 4.35, which was ultimately submitted to the jury. There is no direct evidence that the defense submitted an alternative written instruction to the one given. Further, the court and both counsel reviewed the written instructions before they were given to the jury.

■ More importantly, *Escobar* involved a direct appeal from a district court conviction on federal drug charges. Beardslee attacks his conviction collaterally, after the state supreme court held that no mistake of fact instruction was required under state law. *Beardslee*, 53 Cal.3d at 87–88, 279 Cal.Rptr. at 284–85, 806 P.2d at 1319–20. As we have indicated, "the fact that a jury instruction is inadequate by Ninth Circuit direct appeal standards does not mean a petitioner who relies on such

an inadequacy will be entitled to habeas relief from a state court conviction." *Duckett v. Godinez*, 67 F.3d 734, 744 (9th Cir.1995). Beardslee must show that the alleged error had a substantial or injurious effect on the verdict. *Anderson v. Calderon*, 232 F.3d 1053, 1090 (9th Cir.2000).

Based on the evidence in the case, Beardslee cannot meet the substantial effect standard. First, his alleged mistake of fact would not offer a complete defense to the charges. As both the district court and state supreme court noted, even assuming that the women were dead when Beardslee dealt the final blows, his participation up to that point would have been sufficient to support a first degree murder verdict. Second, a significant amount of evidence countered the mistake-of-fact theory. Beardslee repeatedly described a slight motion made by the two victims before he administered the final blow, undermining his claim that he believed they were dead. In Beardslee's initial statement to the two detectives, he claimed he killed the women because he didn't want them to suffer, though he later claimed he did not remember making that statement. Although it does not necessarily indicate Beardslee's belief, forensic evidence demonstrated that the women were, in fact, alive when Beardslee dealt the final blows.[10] We therefore affirm the district court's grant of summary judgment.

## IV

Beardslee next raises two claims relating to the admission of evidence in the penalty phase. First, he claims that the trial court erred by excluding evidence of

---

**10.** Stacey Benjamin lost considerable blood through the throat wound, indicating she was still alive when her throat was slit. Patty Geddling's left lung continued to fill with blood after she was shot in the right chest, indicating that the final shot to the head was

fatal, and Beardslee admittedly fired the final shot. Although the defense attempted to argue that the chest wound was, in fact, fired last, the pathology evidence was quite convincing, and Beardslee originally admitted shooting Geddling in the head twice.

his co-defendants' sentences, especially given that the prosecution claimed Beardslee was "in cahoots" with Rutherford. Second, under the "fruit of the poisonous tree" doctrine, Beardslee argues that the court erred in admitting evidence relating to the prior homicide.

### A

■ Before the penalty phase started, Beardslee's counsel moved to admit evidence of the co-defendants' sentences, because none of them had received the death penalty. On Beardslee's theory of the case, several of the co-defendants were more responsible for the homicides, because they had instigated events and Beardslee had only acted out of fear of Rutherford. The trial court declared co-defendant sentences irrelevant to the disposition of Beardslee's case and denied the motion.[11] The California Supreme Court affirmed that co-defendant sentences were irrelevant to Beardslee's proper punishment. *Beardslee,* 53 Cal.3d. at 111, 279 Cal.Rptr. at 300, 806 P.2d at 1335. The district court granted summary judgment to the State on similar grounds.

■ Beardslee offers three arguments in support of admitting this evidence, but none of them is persuasive. First, he claims that co-defendants' sentences may be "circumstances of the offense" within the meaning of *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (holding that a sentencer "must not be precluded from considering . . . any of the circumstances of the offense that the defendant proffers"). The State responds that this rule refers only to "individualized" factors relating to the defendant's

character and record. *See Zant v. Stephens,* 462 U.S. 862, 878–79, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (stressing the consideration of individual circumstances, rather than statutory aggravating circumstances). Although a trial court is not necessarily precluded from allowing consideration of co-defendant sentences, a trial court does not commit constitutional error under *Lockett* by refusing to allow such evidence. *See Schneider v. Delo,* 85 F.3d 335 (8th Cir.1996); *Brogdon v. Blackburn,* 790 F.2d 1164, 1169–70 (5th Cir. 1986); *see also Hatch v. Oklahoma,* 58 F.3d 1447, 1466 (10th Cir.1995) (rejecting the claim that "comparative proportionality" review is required); *Roach v. Martin,* 757 F.2d 1463, 1482 (4th Cir.1985) (same).

Second, Beardslee urges that a death penalty may not be based on evidence that the defendant had no opportunity to deny or explain. *Gardner v. Florida,* 430 U.S. 349, 362, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). Beardslee contends that the prosecutor called for the death penalty after arguing that Beardslee was "in cahoots" with Rutherford, implying that Rutherford had already received the death penalty and that it was only fair that Beardslee should receive the same. Beardslee argues that the trial court's ruling denied him the opportunity to respond. However, a close reading of the record reveals that the prosecutor made no reference to Rutherford's penalty, nor did the general discussion refer to anything more than the degree of Beardslee's participation.[12] Rather, the prosecutor countered the defense argument that Beardslee acted only out of fear of Rutherford, arguing that, instead, the two worked together. Moreover, *Gardner* involved the explicit with-

---

**11.** The court made its position explicit to the jurors after one of them submitted a note requesting such evidence.

**12.** The exact words were: "Beardslee knew exactly what was happening because he was in cahoots with Rutherford about the murders of Patty Geddling and Stacey Benjamin."

holding of relevant evidence from the defendant. 430 U.S. at 352–53, 97 S.Ct. 1197 (noting that a confidential portion of the presentencing report was not disclosed to defense counsel). Vague insinuation by a prosecutor in closing argument belongs in a very different category.

Finally, Beardslee argues that different sentences for equally culpable co-defendants violate the prohibition against arbitrary imposition of the death penalty in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). He cites a Florida case in support of this proposition, *Slater v. State*, 316 So.2d 539, 542 (Fla. 1975). However, the facts in that case are far different. In *Slater*, the trial court had disregarded a jury recommendation and imposed the death penalty on a participant in a fatal armed robbery when the actual triggerman had already pled to a life sentence. The state supreme court reduced his sentence to life in prison. Beardslee, by contrast, actually administered the fatal blows.[13] Moreover, Beardslee is not situated similarly to his co-defendants. He was the only defendant charged with the special circumstance of a previous murder, and he was the only one who physically participated in both California homicides. The district court properly granted summary judgment on this claim.

## B

▮ Beardslee also argues that the trial court erred by admitting evidence about the prior homicide he committed in Missouri. In the trial court, both parties stipulated that Missouri detectives had interrogated Beardslee outside the presence of counsel, obtained key evidence as a direct result of this illegal confession, and then lied about these facts during a motion to suppress by Beardslee's Missouri attorney. Because of the possible taint attaching to the confession and plea, prosecutors chose to admit only physical evidence related to the crime scene and Beardslee's January 1982 testimony at the Rutherford preliminary hearing that he had committed the murder.

The California Supreme Court denounced the Missouri officer's "egregious" conduct, but held that Beardslee's testimony had been both voluntary and sufficiently removed from events in Missouri, thus removing any taint. *Beardslee*, 53 Cal.3d at 109, 279 Cal.Rptr. at 299, 806 P.2d at 1334. The court also stressed that California officials had acted completely within the law, so they should not be punished for very old acts of officers in another state. *Id.* at 111, 279 Cal.Rptr. at 300, 806 P.2d at 1335. Two justices dissented from the state supreme court ruling on this point, arguing that the original violations were serious, that the defendant's admissions flowed directly from them, and that the admission was clearly prejudicial. *Id.* at 118, 279 Cal.Rptr. at 305, 806 P.2d at 1340 (Mosk, J., dissenting); *id.* at 119, 279 Cal. Rptr. at 306, 806 P.2d at 1341 (Broussard, J., dissenting). The district court granted summary judgment to the State, holding that Beardslee's statement was voluntary and free from any coercion or inducement by the California police.

This claim presents a relatively novel issue, as no other case appears to involve

---

13. *Messer v. State*, 330 So.2d 137 (Fla.1976), applies the *Slater* rule to the triggerman in a joint robbery-murder. Some California cases have also suggested that very different sentences for similar facts can give rise to Eighth Amendment violations. *People v. Dillon*, 34 Cal.3d 441, 194 Cal.Rptr. 390, 668 P.2d 697 (1983). However, we have restricted proportionality analysis under *Dillon* to whether the sentence imposed is grossly disproportionate to the crime committed. *United States v. Cupa–Guillen*, 34 F.3d 860, 864 (9th Cir. 1994).

a defendant who freely described a prior murder to police officers in a homicide investigation, only to have those statements become the sole evidence of his involvement in that crime because of subsequently discovered constitutional problems with the prior conviction. Nonetheless, standards developed for the admission of a confession obtained after a defendant's rights have been violated suggest that the state courts and the district court were correct in rejecting Beardslee's claim. Under this line of cases, even though Beardslee may not have been convicted (nor later testified about the crime) "but for" serious constitutional violations, his statements are admissible if they are "sufficiently an act of free will to purge the primary taint" of illegal conduct. *Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Applying this rule to a confession obtained following a warrantless search and arrest, the Supreme Court held that whether such a confession is the product of free will depends upon "a host of factors," including the *Miranda* warnings, "the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416, (1975) (citations omitted).

To the extent they are applicable, most of · these factors enervate Beardslee's claim. California officers advised him of his rights before each statement. Twelve years passed between the initial police misconduct and Beardslee's statements. The California homicides presented significant "intervening circumstances," giving Beardslee an entirely separate reason to reveal this information. The official misconduct in Missouri was especially flagrant and was aimed directly at securing evidence against Beardslee, but it did not involve the California police, nor evidence of the California crime at issue.

Of course, these factors are meant to test the connection between illegal police conduct and a subsequent confession within the same investigation, while Beardslee's case involves an entirely different crime and an unrelated police agency. However, the addition of these two factors would make the connection even more tenuous than the common *Brown* situation. If the *Brown* factors weigh against exclusion of the testimony, they should apply with stronger force to Beardslee's case.

Beardslee disputes this analysis, arguing that the San Mateo police exploited the illegal Missouri conduct by using Beardslee's statements in the penalty phase. He contends that, although California officials may not have known that Beardslee's plea had been tainted at the time of the statements, they later took advantage of Beardslee's misinformed decision and introduced evidence that proved critical to his sentence.

Few cases applying the *Brown* criteria address the admission of a prior, unrelated conviction, and none are completely analagous to Beardslee's situation. However, we recently held that a statement about prior homicides given in custody was admissible even though the detention itself violated the defendant's Fourth Amendment rights. *Anderson,* 232 F.3d at 1090. We rejected Anderson's "fruit of the poisonous tree" argument, noting that Anderson was spurred to talk by his capture rather than by the specific rights violation and that he volunteered the information for another purpose (to benefit his falsely accused friends). Both of these factors have parallels in Beardslee's case. At the same time, unlike Beardslee, Anderson volunteered the informa-

tion before the rights violation even occurred, there was no suggestion that the prior convictions had been tainted, and the constitutional violation was not clear at the time of the official conduct. *See also Sparkman v. Estelle,* 672 F.2d 559 (5th Cir.1982) (allowing testimony about a defendant's reputation learned through investigation into a prior, invalidated conviction because exclusion would serve no deterrent purpose).

Under the unique circumstances presented by this case, the district court did not err on collateral review in holding that the admission of the evidence did not require a grant of the habeas petition. First, the decision was voluntary, aimed at securing mitigation through cooperation with authorities. Of course, in retrospect, that decision was based upon inaccurate information, and had Beardslee known that the initial conviction was subject to challenge, he might not have agreed to discuss it. However, nothing in the case law suggests that voluntariness in this context depends upon knowing whether the prior conviction was constitutionally infirm. Second, the connection between the Missouri misconduct and Beardslee's statement is attenuated by the passage of more than a decade, a change in location, and two intervening homicides. While none of these changes removes the "but for" connection between Beardslee's situation and the illegal conduct, the same is true of most attenuation cases. Finally, the exclusionary rule is designed to deter police misconduct, and the exclusion of evidence from an entirely separate trial years later would have little additional deterrent value upon those in the position of the Missouri police officers. Because California officials did not even know that the prior conviction was tainted at the time of Beardslee's statements, deterrence would have little effect on them either. *See also Douglas v. Woodford,* 316 F.3d 1079, 1093 (9th Cir.

2003) (allowing the use of subsequent, voluntary testimony in California courts by a witness whose original confession to Mexican police was allegedly obtained through threats and physical violence).

## V

### A

■ Beardslee argues that his trial counsel rendered ineffective assistance at the penalty phase by presenting the testimony of Dr. George Wilkinson, who testified that Beardslee was a "sociopath." Under direct examination by Beardslee's trial counsel, Wilkinson described the sociopathic diagnosis at length, listing characteristics such as unreliability, untruthfulness, and lack of remorse. On cross examination, Wilkinson admitted that sociopaths are manipulative, that some of Beardslee's representations may have been untruths, and that his prognosis for recovery in the immediate future was dim. Beardslee claims his attorney failed to recognize that the testimony would be harmful, failed to recognize that the diagnosis was incorrect, and failed to get a second opinion, even though funds would have been available for this purpose.

■ The district court construed Beardslee's claim as one of ineffective psychiatric assistance during trial and held that it was barred by the *Teague* doctrine, which prohibits the creation of new rules through habeas corpus petitions. Relying on *Harris v. Vasquez,* 949 F.2d 1497 (1991), the district court held that case law at the time Beardslee's conviction became final would not permit federal review of the substance of a psychiatric evaluation. Rather, Beardslee was entitled to publicly funded psychiatric assistance, which he actually received.

On appeal Beardslee reiterates that his claim relates to the assistance of counsel, not psychiatric assistance, a right that was well established by 1991. Beardslee's mental health expert testified that Wilkinson simply made up the sociopath diagnosis, and Beardslee's *Strickland* expert declared that competent counsel should have known that diagnosis as a sociopath would have been extremely harmful. As Beardslee points out, recent Ninth Circuit cases assume that competent counsel regularly evaluate the potential impact of psychiatric testimony. *See Pawlyk v. Wood,* 248 F.3d 815, 823 (9th Cir.2001); *Murtishaw v. Woodford,* 255 F.3d 926, 945 (9th Cir.2001).

We disagree with the district court decision that this claim is barred by *Teague.* If Beardslee's counsel failed to understand basic psychiatric diagnoses and thus failed to make simple tactical decisions about effective defenses, such assistance might be constitutionally deficient. Review of these claims would not necessarily require courts to evaluate psychological testimony substantively. Rather, just as in other ineffective assistance claims, courts would have to evaluate whether counsel had plausible reasons for making decisions, starting from a strong presumption of correctness. We already routinely review the extent of attorney investigations into the mental health of their clients in order to evaluate ineffective assistance claims. *Jennings v. Woodford,* 290 F.3d 1006, 1013 (9th Cir. 2002); *Rios v. Rocha,* 299 F.3d 796 (9th Cir.2002).

However, even though we disagree with the district court's *Teague* ruling, we affirm the dismissal of Beardslee's claim and request for an evidentiary hearing. Beardslee is only entitled to an evidentiary hearing if his allegations establish both deficient performance and substantial prejudice. *Turner v. Calderon,* 281 F.3d 851, 890 (9th Cir.2002). The record demonstrates his inability to do this. Beardslee's counsel understood that Wilkinson's diagnosis could be harmful, but he chose to proceed anyway because he believed the diagnosis to be reasonable. Balliet frequently worked with Drs. Wilkinson and Fricke and had hired them to investigate the questions of competence and possible mental defenses. Moreover, Dr. Wilkinson provided useful mitigating evidence for Beardslee, including an explanation for his failure to openly show remorse, testimony on his good behavior in prison, and both physical and psychological explanations for his antisocial behavior. The fact that he also provided some damaging testimony does not mean that the decision to use him as a witness fell below an objective standard of reasonableness. Rather, it presented a strategic decision. Whether or not it may have been better to forgo Dr. Wilkinson's testimony, the record does not show that Beardslee's counsel failed to make reasonable decisions untethered to trial strategy.

### B

Beardslee also claims that the prosecutor committed misconduct by calling on the jury to punish him for three murders rather than the two for which he was actually on trial. The State responds that the prosecutor's comments properly characterized the Missouri homicide as an aggravating factor, that the court properly instructed the jury on how to consider the three homicides, and that, in any case, the comments did not deprive Beardslee of a fundamentally fair trial.[14] The district

14. The State also argues that the claim is procedurally defaulted by Beardslee's failure to object to the comments during the trial.

However, as the district court noted, Beardslee alleges cause by raising an ineffective

court noted the prosecutor's statements about the three murders without labeling them misconduct and granted summary judgment to the State, largely because the trial court properly instructed the jury to decide the question of punishment based on the two California murders.

■ Generally, the relevant question in cases of prosecutorial misconduct is whether the comments "so infected the trial with unfairness as to make the conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431(1974)). Moreover, as the district court noted, a defendant's involvement with another homicide may be properly argued as an aggravating circumstance under California law. *People v. Sanchez,* 12 Cal.4th 1, 70, 47 Cal. Rptr.2d 843, 906 P.2d 1129 (1995). Beardslee acknowledges this point but contends that in this case the prosecutor failed to argue the prior homicide merely as an aggravating factor and therefore rendered the trial unfair.

In his opening and closing statements, the prosecutor referred to Laura Griffin on numerous occasions and frequently grouped her death together with those of Stacey Benjamin and Patty Geddling. He began by telling the jury they had been "chosen to determine what the punishment should be for the defendant who sits before you, responsible now for three murders." He ended his opening remarks by implicitly linking the death penalty to all three murders, calling it "something that the defendant has virtually deserved and which he has earned by his brutality, his inhumanity to others and his dangerous-

ness. Three murders is more than enough." Similarly, he argued in closing that the death penalty was "most appropriately used" for individuals with a "persistent pattern of life-endangering conduct." [15] He argued the death penalty

should be reserved for those individuals who involve themselves in particularly heinous crimes such as here where the violent propensities of the individuals have been documented or demonstrated over a long period of time. What more do you want in this case? Each woman's death—I'm speaking of all three now—were unique in the way they were slaughtered.

After describing each homicide, he added "all three women were killed separately by separate means, illustrating a long pattern of violent conduct." On two occasions he explicitly compared the wounds on Griffin's body with those inflicted on Benjamin. He even ridiculed Beardslee's motive for the California killings by asking, "Was Frank Rutherford present when he killed Laura Griffin? Of course not."

By referring to these three homicides in a group, the prosecutor implied that Beardslee deserved the death penalty for all three killings, which pushed the boundaries of permissible argument. However, the prosecutor also sometimes differentiated between the California and Missouri killings, referred to the guilt phase jury's finding of guilt only with respect to the two murders, correctly labeled the Griffin killing an "aggravating factor," called on the jury to punish the defendant for the two California murders in his very last remarks, and, in general, spent the bulk of his closing argument addressing the defendant's participation in the California homi-

---

assistance claim against his counsel's failure to object.

15. Carl Holm confirmed in his testimony before the district court that this was intended to encompass the Missouri homicide.

cides.[16] Moreover, the judge labeled the Griffin homicide an "aggravating circumstance" and instructed the jury to consider it as such. The instructions also clearly stated that the State was seeking the death penalty for the two California murders. Finally, defense counsel admitted Beardslee's responsibility for the Missouri killing but argued that he had taken responsibility for his action and presented several other factors to mitigate the seriousness of the crime. In these circumstances, it seems unlikely that the jury was confused about the proper role of the Missouri homicide.

Beardslee relies heavily on two cases from other circuits, especially *Lesko v. Lehman,* 925 F.2d 1527 (3d Cir.1991). *Lesko* held that the prosecutor's remarks urging the jury to do its "duty" and even the "score," which he described as "[defendants] two, society nothing," constituted an improper appeal to the jury to punish the defendant for an earlier murder (in this case, one committed a few hours earlier in a different county). *Id.* at 1545. Similarly, the Fifth Circuit criticized a closing argument in which the prosecutor justified his call for a sentence of forty years by listing three previous crimes along with the current charge, arguing that they were worth ten years each. *Rogers v. Lynaugh,* 848 F.2d 606, 610 (5th Cir.1988). Because the jury adopted exactly that sentence, the court of appeals held that the argument was both improper and prejudicial and affirmed the district court grant of the habeas petition. Unlike Beardslee's case, however, the prosecutors' comments in these two cases linked more explicitly the jury's sentencing duty to the prior crimes themselves, rather than through the lens of an aggravating factor. Given these differ-

ences, and the overall character of the trial, we affirm the district court's decision to grant summary judgment to the State.

 On a related claim, Beardslee argues that his trial counsel rendered ineffective assistance by failing to object to the prosecutor's calls to punish him for all three murders, and that he merits an evidentiary hearing on this issue. The relevant facts in this case involve prosecutorial comments entered directly into the court's record, leaving no disputed facts at issue. Petitioner, however, requested an evidentiary hearing in order to present expert testimony on the reasonable standard of care for defense counsel in San Mateo county at the time of trial. The district court rejected this request based solely upon the record in the case and granted summary judgment to the State. The court found the prosecutor's argument "proper and admissible," since the jury was entitled to know Beardslee was on parole from a previous homicide.

 Beardslee is entitled to an evidentiary hearing on a habeas claim if (1) the allegations, if proven, establish the right to relief, and (2) he did not receive a full and fair evidentiary hearing in the state court. *Williams v. Calderon,* 52 F.3d 1465, 1484 (9th Cir.1995). However, an evidentiary hearing is not required if the claim presents a purely legal question and there are no disputed facts. *Id.* We review a district court's decision to deny an evidentiary hearing for abuse of discretion. *Tapia v. Roe,* 189 F.3d 1052, 1056 (9th Cir.1999). In this case, because the transcript already contained the prosecutorial comments, defense counsel responses, and the entire trial context, the district

---

**16.** For example, the prosecutor argued that "the Laura Griffin murder ... [is] an aggravating factor, let's face it. If it were absent, you could say that's a mitigating factor. You could say that no other time other than this has the defendant ever been involved in violent conduct. But he has, so this is an aggravating factor."

court exercised proper discretion in choosing to deny the evidentiary hearing and forgo additional testimony on what effective counsel should have done.

 Furthermore, because the prosecutor's comments were not outside the boundary of permissible argument, competent counsel might have decided not to object. Conceivably, the strategy to concede responsibility for the Missouri killing in order to develop mitigation may have counseled against objections to general statements that Beardslee was responsible for three killings. Moreover, the defense team raised the possibility of improper calls to punish Beardslee for the Missouri homicide in a pretrial motion to exclude the Missouri evidence under California Evidence Code § 352. The prosecutor responded that the prior homicide constituted evidence on the background and character of the defendant and as such was appropriate for the jury to hear. The judge dismissed the motion as without merit. Although objections to potential testimony clearly differ from objections to actual comments, this at least demonstrates that counsel was aware of the issue. We affirm the district court's grant of summary judgment on this claim as well.

### C

 Beardslee next claims that the prosecutor's discussion of his lack of remorse implied a criticism of his decision not to testify, which would violate the rule laid out in *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). A prosecutor's comment is impermissible if it is "manifestly intended to call attention to the defendant's failure to testify or is of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify." *United States v. Tarazon*, 989 F.2d 1045, 1052 (9th Cir.1993).

 The prosecutor called attention to the absence of any demonstration of emotion by Beardslee, arguing that he was incapable of showing emotion because he had no remorse. The prosecutor then continued: "Since you only heard the defendant through the tape recorder and his previous testimony, you were not able to observe his demeanor and sincerity at the time he testified so you, too, could judge if there was any feeling in the man." The court overruled a defense objection, and the prosecutor continued: "Wouldn't you expect a man on trial for his life would, through his statements, cry out for forgiveness, cry out for pity? He did not. Never heard any in the statements."

Beardslee argues that by calling attention to his failure to express remorse, the prosecutor implicitly criticized his decision not to testify at the penalty phase. In addition, the prosecutor's comments referred to statements from the Rutherford preliminary hearing, at which Beardslee was a witness, and to the guilt phase, at which Beardslee denied willing participation in the killings. Neither occasion presented a logical opportunity to beg for mercy, Beardslee implies, so the only possible way he could show such remorse would be to testify before the penalty phase jury, something he is not obligated to do under the Fifth Amendment. Beardslee again relies heavily on *Lesko*, 925 F.2d at 1544–45 (holding that criticism of the defendant's failure to express remorse penalized his assertion of Fifth Amendment rights).[17]

17. The State attempts to distinguish *Lesko* as a case in which the court found that the prosecutor's comments referenced the defendant's failure to testify, whereas both the state supreme court and district court found the opposite in Beardslee's case. Yet the com-

The State, in contrast, frames the issue as lack of remorse, citing cases in which such comments were permissible, often in response to mitigation evidence presented by defendants on the degree of remorse. *See, e.g., Williams,* 52 F.3d at 1483.[18] The California Supreme Court rejected Beardslee's *Griffin* claim on precisely these grounds, noting that the prosecutor was entitled to comment on the lack of remorse in the defendant's statements "in whatever form they were brought before the jury" and on his facial demeanor. *Beardslee,* 53 Cal.3d at 114, 279 Cal.Rptr. at 301, 806 P.2d at 1337. The district court agreed and characterized the comments as limited to courtroom demeanor, adding that even if they were impermissible, they would not meet Ninth Circuit standards for reversal.

Beardslee responds that the prosecutor's choice of language went beyond mere demeanor and implicated his refusal to testify. We agree. The reference to the jury not being "able to observe" whether "there was any feeling in the man" contrasts the actual trial with a hypothetical one in which the defendant testified. These comments were impermissible under *Griffin.*

However, under our precedent, prosecutorial comments on failure to testify only require reversal "where such comment is extensive, where an inference of guilt from silence is stressed to the jury as a basis for the conviction, and where there is evidence that could have supported acquittal." *Lincoln v. Sunn,* 807 F.2d 805, 809 (9th Cir.1987) (quoting *Anderson v. Nelson,* 390 U.S. 523, 88 S.Ct. 1133, 20 L.Ed.2d 81 (1968)). *See also U.S. v. Olano,*

62 F.3d 1180, 1196 (9th Cir.1995) (applying these standards to various prosecutorial comments); *Jeffries v. Blodgett,* 5 F.3d 1180, 1192 (9th Cir.1992) (quoting these standards with approval). In this case, the comments were clearly not extensive, and though the prosecutor may have implied that constitutionally protected silence meant a lack of remorse, it was not stressed to the jury. Thus, although *Griffin* error occurred, it does not require reversal.

Beardslee attempts to distinguish this line of cases, arguing that (1) all of them involve guilt phase rather than penalty phase arguments, and (2) many of them also involve curative instructions by the trial court, which are absent in the present case. We reject Beardslee's distinction and affirm the district court grant of summary judgment to the State.

First, the reasoning behind both the *Griffin* rule and the limitations on its application apply equally to the trial and penalty phases: federal courts seek not only to protect a defendant's Fifth Amendment rights but also to restrict collateral review to serious constitutional violations. Second, we have applied related language and standards from this line of cases to alleged prosecutorial misconduct in penalty phase comments. *See Turner,* 281 F.3d at 868. Third, the defense team presented considerable testimony to explain Beardslee's inability to express emotion. Douglas Gray, his previous attorney, testified that Beardslee "certainly ... had remorse concerning what had transpired," but also that it was difficult to gauge because he "simply exhibits no emotions." Similarly,

---

ments are actually somewhat similar; the *Lesko* court merely inferred a comment on the failure to testify, while the California Supreme Court did not.

18. Beardslee argues that because Williams was tried under the 1977 death penalty statute, which permitted non-statutory aggravating factors, the court was more willing to countenance the consideration of courtroom demeanor.

Dr. Wilkinson testified extensively about Beardslee's inability to show emotion. Because the defense offered an explanation for the lack of emotion, and because the prosecutorial comments were both brief and less than explicit, there is little probability that the comments could have affected the verdict. *Lincoln*, 807 F.2d at 809; *see also Tarazon*, 989 F.2d at 1052. Therefore, reversal is not required.

Beardslee also claims that the trial court violated his constitutional rights by failing to instruct the jury not to draw a negative inference from the prosecutor's comments. We agree that the trial court's failure to offer a curative instruction compounded the *Griffin* error. However, because Beardslee fails to demonstrate any substantial or injurious effect on the verdict, reversal is not required on habeas review. *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

Beardslee counters that any such evidence would be impossible to produce, since juror testimonials are not admissible. He again cites *Lesko*, 925 F.2d at 1546–47, for the proposition that, in the absence of a curative instruction, prosecutorial comments on failure to testify may be harmful. However, when the comments are limited in nature and could not have affected the verdict, we have declined to reverse even in the absence of curative instructions. In *Tarazon*, we acknowledged that a prosecutor's comment violated the defendant's Fifth Amendment rights and noted that it was not followed by a curative instruction,

but we nonetheless affirmed the district court. 989 F.2d at 1052–53. *Tarazon* was conducted on plain error review because the defendant had failed to object at trial, but the case suggests that the absence of an appropriate instruction does not automatically warrant reversal. In Beardslee's case, despite the constitutional violation, the limited nature of the comments and the overall context of the trial suggest that the prosecutor's statements did not affect the verdict. We affirm the district court dismissal of this claim.

### D

■ Beardslee also objects to the court's response to two notes received from the jury during the penalty phase. First, he argues that the court failed to inform counsel of a note requesting information on co-defendant sentences received toward the end of the penalty phase. Beardslee argues that this note would have affected counsel's tactical decision whether or not to call co-defendants to the stand. Second, Beardslee argues that the court denigrated his mitigation arguments in its ex parte response to a note received during deliberations. We affirm the district court on both claims.

At some point before the case was submitted to the jury, a single juror submitted a note to the court asking a series of questions, including whether the jury could request co-defendant testimony or additional psychological tests.[19] Beardslee's

19. The full text of the note read as follows: These need not be answered prior to the start of the deliberations. (1) Can conditions be placed on the penalty? In other words, can the lesser sentence be given under the condition that certain provisions are met? Must the jury arrive at an unconditional verdict? (2) Can the jury, in the course of deliberations, request that certain witnesses be recalled to give additional testimony or to ask questions[?] (3) What would be the result of a hung jury (i.e. what would or could be the sentence be under such circumstances)[?] (4) How long will the jury be allowed to continue deliberations? Under what circumstances will deliberations either be continued or brought to a halt[?] (5) If it were deemed by the jury to be decisive, would it be within the authority of the jury to request additional psychological tests (such as with phenobarbi-

counsel first challenged the court's failure to show the defense the note in post-trial proceedings held to settle the record. Although the prosecutor recalled seeing the note, he did not specifically recall showing it to defense counsel (though he stated that was his practice). Both of Beardslee's defense attorneys testified that they had not seen the note and that they would have remembered because it affected a strategic decision about whether to call Beardslee's co-defendants to testify. The trial court concluded that it was "inconceivable" that defense counsel hadn't been shown the note. On direct appeal, the state supreme court deferred to the trial court's conclusion, adding that remarks made by the trial court toward the end of the trial appeared targeted toward the note and implied that defense counsel were aware of the questions asked. *Beardslee*, 53 Cal.3d at 116, 279 Cal.Rptr. at 303, 806 P.2d at 1338.

The district court concluded that the trial court's decision was not supported by the record and conducted its own evidentiary hearing. After hearing testimony by the former prosecutor and defense counsel, the district court held that there was insufficient evidence to determine whether or not defense counsel had seen the note. The court therefore assumed defense counsel had not seen the note but held that the trial court's error was not prejudicial.

As the district court found, Beardslee fails to show that the trial court's error

had "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637, 113 S.Ct. 1710; *see also United States v. Barragan–Devis*, 133 F.3d 1287, 1289 (9th Cir.1998) (acknowledging that failure to show defense counsel a jury note was error but subjecting the mistake to harmless error analysis). The judge's admonition to the jury on January 13 appears to answer all of the legal questions raised by the note, whether or not it was a direct response to the note itself.[20] At the evidentiary hearing, Balliet testified that several of the questions would have led him to call Frank Rutherford, something he had been debating anyway. As he admitted on cross-examination, however, he knew that Rutherford was likely to assert the Fifth Amendment and that the judge would not allow him to go in front of the jury if that was his intention. Because the jury would not have even seen Rutherford, the judge's decision undermines Beardslee's argument that the mere presence of Rutherford might have allowed the jury to view his menacing character. Similarly, though Balliet testified that several of the questions would have prompted him to request that the judge encourage the jury to consider a penalty .other than death, he also admitted that the judge's statement to the jury was legally correct and that he could not suggest any other specific instructions that were legally required. Moreover, defense counsel had already spent the entire

---

tal) on the defendant or on any of the other parties to the crime? Could the jury insist on hearing or seeing the testimony of other codefendants if such were deemed vital to a resolution of the proper sentence for this case?

**20.** The state court pointed to this passage as evidence that the judge responded to the note in open court, suggesting that counsel had been shown the note. However, defense counsel might not have recognized these general instructions as a specific response to a

note they had not seen. Nothing in the judge's statement addresses the possibility of co-defendant testimony or an alternative sentence, the items in the note that most struck defense counsel, and the judge had received several other jury notes. On cross-examination at the evidentiary hearing, Balliet also testified that he had never previously considered that the judge's statement might have been a response to the note, again indicating he had not seen the note.

trial urging the jury to consider a penalty other than death, and receipt of this note could do little more than offer encouragement that the jury was receptive to the argument. The district court properly held that Beardslee failed to demonstrate prejudice on this claim.

■ Beardslee also challenges the trial court's curt response to a juror request for information about the possibility of Beardslee receiving therapy in prison. On January 19, a juror asked the court whether the defendant would "receive either 'group attack' therapy or psychiatric help if given life without parole." The court immediately responded with a note saying, "[d]isposition by the Department of Corrections is not a part of the decision you must make. This court has no jurisdiction over the Department of Corrections." The following morning, the prosecutor read the note into the record and asked if defense counsel wished to add anything, since the jury was about to arrive. Defense counsel declined the offer.[21]

Beardslee argues that the court's response undercut one of the principal arguments for a life sentence raised by the defense. Dr. Wilkinson testified that "sociopaths" have a difficult time changing in response to individual psychotherapy but may respond much better to group therapy. Beardslee claims that the note foreclosed the jury from considering the possibility of therapy, denying his right to have all mitigating evidence considered. The district court granted summary judgment to the State, holding that the trial court

merely responded "in a direct and truthful manner" to the juror inquiry. The district court refused to infer any implication for the jury's ability to consider all relevant testimony, including that of Dr. Wilkinson.

■ Juries must consider all evidence put forward in mitigation, including relevant evidence of behavior after the crime was committed. *Skipper v. South Carolina,* 476 U.S. 1, 5–6, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986). Written instructions in response to juror notes may be treated as jury instructions for purposes of review. The question therefore becomes whether, viewing the case as a whole, the court's instructions properly guided the jury to consider Beardslee's mitigating evidence. *Payton v. Woodford,* 299 F.3d 815, 823 (9th Cir.2002) (en banc).

The trial court instructed the jury that they should consider any "aspect of the defendant's character that the defendant proffers as a basis for the sentence less than death." The court also instructed the jury to give each mitigating factor the weight they believed it deserved and reminded them that they were not forbidden from considering pity. Moreover, the court's subsequent statement that jurors could not consider the particular "disposition" that would be imposed by the Department of Corrections was correct on its face.

Nonetheless, the court's blunt response, which failed to indicate that the jury could still consider the possibility for rehabilitation, and the fact that the court answered within five minutes of the question being submitted, may have implied to the jury

21. The State argues that the failure to object means Beardslee's claims are barred from habeas review by the independent and adequate ground of state procedural default. This argument is groundless. Although the state court noted that Beardslee was barred from challenging the procedural irregularity of the court's ex parte communication as well as any failure to elaborate further, the court

reached the merits of Beardslee's challenge to the *content* of the court's response. *Beardslee,* 53 Cal.3d at 117, 279 Cal.Rptr. at 304, 806 P.2d at 1339. Moreover, the district court held that Beardslee's claims of inadequate assistance of counsel provided the "cause and prejudice" necessary to overcome any state procedural default and allow the district court to reach the issue on the merits.

that they could not even consider the possibility of therapy. This possibility takes on added significance given that the prosecutor emphasized Beardslee's future dangerousness in closing argument. On several occasions, the prosecutor stressed that Beardslee would pose a threat to others in prison, calling him an "extremely dangerous and merciless individual ... who may kill again for the slightest provocation." Moments later, he added: "We do not know when the defendant will strike out in his murderous ways. Who knows what types of pressures he might suffer or cause the defendant to react and kill? State prison is an extremely volatile place." In further closing argument, the prosecutor stressed that our society "includes the inmates in state prison, the guards and other people," who are "human beings" with "a right to the protection of freedom in assaults and things that go on in prison." Given this argument and the court's swift response, a jury may have discounted Beardslee's potential for rehabilitation.[22]

Although the question is close, we affirm the district court's grant of summary judgment on this claim. Taken as a whole, the instructions do not discourage the jury from considering Beardslee's mitigating evidence. Furthermore, Dr. Wilkinson testified that Beardslee had been a model prisoner and had adjusted well to prison life. The timing and wording of the court's message, while certainly not favorable to the defendant, did not literally refer to the possibility for rehabilitation. Finally, the jury instructions unambiguously permitted consideration of any mitigating evidence, unlike the recent situation in *Payton*, 299 F.3d at 824 (invalidating earlier jury instructions as too vague to guarantee that the jury considered post-conviction rehabilitation). Taken as a whole, there is no "reasonable likelihood" that the jury was prevented from considering constitutionally relevant evidence. *Id.* at 823 (quoting *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990)).

## VI

Finally, Beardslee argues that the cumulative impact of multiple errors entitles him to relief. The district court did not rule on this claim, though it is cognizable. *See Karis v. Calderon*, 283 F.3d 1117, 1132 (9th Cir.2002) (recognizing the possibility but denying relief); *Ceja v. Stewart*, 97 F.3d 1246, 1254 (9th Cir.1996) (same); *Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir.1992) (granting relief). The record indicates several constitutional violations, including the court's failure to clarify guilt phase instructions, the court's improper ex parte response to the juror note, and the prosecutor's comments on Beardslee's refusal to testify. Each of these potential errors is harmless individually. Although they carry slightly more weight cumulatively, the aggregate errors still fall short of causing a substantial impact on the verdict or the denial of a fundamentally fair trial. We therefore deny Beardslee's cumulative error claim.

For the foregoing reasons, we affirm the district court judgment dismissing the petition for writ of habeas corpus.

**AFFIRMED.**

---

**22.** Two jurors also signed affidavits attesting that the jury was very close to recommending life in prison and would have done so if Beardslee could receive therapy in prison. The judge's note cut off this line of inquiry, since it meant they "were not to consider the possibility of therapy." Although emotionally compelling, these statements are inadmissible under Federal Rule of Evidence 606(b).